Debra (Siegel) CARMICHAEL, Appellant–Respondent,

v.

Michael J. SIEGEL, Appellee–Petitioner.

No. 29A02–0011–CV–740.

Court of Appeals of Indiana.

Aug. 31, 2001.

---

David W. Stone, IV, Stone Law Office & Legal Research, Jane G. Cotton, Anderson, IN, Attorneys for Appellant.

Marvin E. Coffey, Robinson & Heck, Indianapolis, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Debra Siegel Carmichael ("Mother" or "Respondent") appeals the trial court's calculation of her child support obligation for her children, R.S. and S.S., pursuant to a petition to modify child support brought by Michael Siegel ("Father" or "Petitioner"). Mother also appeals the granting of sole legal custody of R.S. and S.S. to Father, the trial court's visitation order regarding S.S., and its refusal to find Father in contempt of court. We affirm in part, reverse in part, and remand.

### Issues

We restate the issues raised by Mother as follows:

I. whether the trial court erroneously determined her child support obligation because:

 A. it improperly found her to be underemployed;

 B. it improperly imputed income to her based upon the expected annual returns of her IRAs;

 C. it failed to adjust her weekly gross income to account for an after-born child;

 D. it should have imputed additional income to Father; and

 E. it improperly ordered her to pay part of the cost of R.S.'s private school education;

II. whether there was sufficient evidence to modify the custody arrangement for R.S. and S.S. from

joint legal custody to sole legal custody with Father;

III. whether there was sufficient evidence to restrict Mother's visitation with her children, especially S.S.; and

IV. whether the trial court erred in not finding Father in contempt for violation of an alleged court order.

### Facts

The parties were divorced in 1992, at which time the parties were granted joint custody of R.S. and S.S. and Father agreed to pay child support in the amount of $1500 per month because Mother was unemployed. Additionally, Father assigned his interest in approximately $286,000 in various individual retirement accounts (IRAs) to Mother, while retaining his interest in various real estate holdings, except for one marital residence that went to Mother but on which Father would continue to make mortgage payments. In 1994, Mother remarried, and she later expressed her intention to move to Florida with her new husband. The trial court then granted primary physical custody of the children to Father, who remained in Indiana, without altering joint legal custody. Mother was ordered to pay weekly support of $56, based on an annual income of $20,000. We affirmed the trial court's custody decision, without being asked to address the support issue, by unpublished memorandum decision in *Carmichael v. Siegel*, 684 N.E.2d 263 (Ind.Ct.App.1997). In November 1997, pursuant to an agreed entry, Father waived further payment of support by Mother "because of the hugh [sic] disparity in income." Record p. 64.

In 1996, R.S. was diagnosed as having Asperger's Syndrome, which is a high-functioning form of autism. Until the beginning of 1999, R.S. was attending public school in Carmel, where he was doing poorly in terms of grades and discipline. A pediatrician treating R.S. referred him to Brehm Preparatory School in Illinois, a private residential school that specializes in educating children with emotional disabilities, including Attention Deficit Disorder and autism. R.S.'s grades and social problems improved after he began attending Brehm in 1999, and the pediatrician believed it was in R.S.'s best interest to continue attending school there and that the only other comparable schools that could help R.S. were located on the east coast. The total annual cost of attending Brehm in 1999 was over $38,000. On April 14, 1999, our supreme court handed down disciplinary action against Father, who was a practicing bankruptcy attorney. *In the Matter of Siegel*, 708 N.E.2d 869 (Ind. 1999). It found Father had intentionally deceived a bankruptcy court by knowingly misrepresenting the ownership status of a client's residence in order to attempt to gain a larger bankruptcy exemption for the property. *Id.* at 870–71. Father's license to practice law was suspended for nine months beginning May 21, 1999, without provision for automatic reinstatement. *Id.* at 872.

On June 4, 1999, Father filed a petition to modify Mother's support obligation, alleging a substantial and continuing change in circumstances had occurred that required Mother to pay support. Father also petitioned for sole legal custody of the children on April 14, 2000. Mother filed a contempt petition on June 19, 2000, alleging Father failed to buy clothing for S.S. in accordance with a court order. After a hearing conducted on June 12 and 13, 2000, and argument on September 18, 2000, the trial court entered findings of fact and conclusions of law stating there was a substantial and continuing change of circumstances that required Mother to pay

both ordinary support for S.S. and R.S. and to pay a portion of R.S.'s Brehm expenses, retroactive to the filing of the modification petition. It also granted sole legal custody to Father, severely restricted Mother's visitation with S.S., and refused to find Father in contempt of any of its orders. Some of the findings and conclusions most relevant to our review follow:

\* \* \* \* \* \*

2) The Court finds that the Respondent is employed at 30 hours per week and receives $9.00 per hour and grosses approximately $270.00 per week.

3) The Court finds that the Respondent is underemployed and imputes $360.00 per week in income, based on Respondent's education and training.

4) The Court further finds that a substantial portion of Respondents [sic] expenses are paid by her present spouse, such as mortgage and utilities.

\* \* \* \* \* \*

6) The Court finds that Respondent has $584,000.00 in tax deferred IRA's.

7) The Court imputes $20,440.00 per year on Respondent's IRA's. Based on the testimony of Respondent's CPA, Respondent could easily earn 7% interest. The CPA testified 10–12% was more probable. The Court however finds that if Respondent took out these funds she would be taxed at 40% federal and a 10% penalty. (There is no state tax where Respondent lives.) Taking 50% of $584,000 equals $292,000 X .07 equals $20,440 per year on her IRA's after taxes and imputes that income to her.

8) Respondent's total income consists of:

$20,440.00 IRA
$ 4,000.00 Real estate [rental]
$18,720.00 Wages

9) Respondent's total income is $43,160.00 per year or $830.00 per week.

10) Petitioner earns from all sources $2,065.00 per week and the health insurance premium for minor children is $217.00 per month or $50.00 per week.

\* \* \* \* \* \*

20) The Court finds that Petitioner and Respondent should share the education expense of Brehm, being $38,160.00, based on their respective incomes.

21) The Court finds that Respondent earns 28.7% of the total income....

\* \* \* \* \* \*

23) The Court finds that Respondent lives in Florida permanently, sees the children irregularly, and the parties do not communicate.

24) Based on those findings and the fact that the children have been residing with Petitioner since Respondent moved to Florida and it is in the best interest of the minor children, the Court finds Petitioner should be granted sole legal custody of the minor children.

25) The Court accepts Dr. Tarr's report and adopts all recommendations set out in Dr. Tarr's report.

26) The Court finds that per Dr. Tarr's report, Respondent shall not have visitation with [S.S.] until Respondent and [S.S.] attend, in Indiana, psychological therapy until such time that the psychologist is satisfied that their damaged relationship is rehabilitated.

\* \* \* \* \* \*

31) The Court finds that neither Petitioner nor Respondent are in contempt of any Court Orders.

\* \* \* \* \* \*

Based on the significant expense of [R.S.]'s education, based on his needs, based on what is in best interest [sic] of [R.S.], and based on the financial resources of the parties, the Court finds that Respondent should pay $10,000.00

for past tuition and $10,000.00 for current tuition and $10,000.00 per year, for each year that [R.S.] attends Brehm Preparatory School.

\*　　\*　　\*　　\*　　\*　　\*

The Court finds that Respondent's expenses for mortgage and utilities are paid by her current husband and deviates from the Guidelines for that reason.

The Court finds that Respondent's income is $43,160.00 per year and that Respondent should pay child support in the amount of $109.00 (one hundred nine) per week, by income withholding, through the Clerk, Hamilton County Court, per attached worksheet.

\*　　\*　　\*　　\*　　\*　　\*

Record pp. 108–12. Mother now appeals.

### Analysis

#### I. Standard of Review

■■■■ The trial court in this case entered Findings of Fact and Conclusions of Law, and so we apply a two-tiered standard to review the court's entry. First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. *Oil Supply Co., Inc. v. Hires Parts Service, Inc.*, 726 N.E.2d 246, 248 (Ind.2000). In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. *Id.* Challengers must establish that the trial court's findings are clearly erroneous. *Id.* Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. *Carnahan v. Moriah Property Owners Ass'n, Inc.*, 716 N.E.2d 437, 443 (Ind.1999). However, while we defer substantially to findings of fact, we

do not do so to conclusions of law. *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind.2000). Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. *Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 972 (Ind.1998). We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions. *Anthem Ins. Companies, Inc. v. Tenet Healthcare Corp.,* 730 N.E.2d 1227, 1237 (Ind.2000).

#### II. Child Support

##### A. Mother's Alleged Underemployment

■■■■ Mother first claims the trial court improperly concluded that she was underemployed and thus improperly imputed an additional $90 per week income to her. We hold that the trial court's finding of underemployment is clearly erroneous because it relied on an incorrect legal standard. When determining whether and in what amount potential income should be attributed to a parent because of his or her voluntary underemployment, courts should consider the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community. Ind. Child Support Guideline 3(A)(3); *In Re Paternity of E.M.P.,* 722 N.E.2d 349, 351 (Ind.Ct.App. 2000). One purpose of potential income is to discourage a parent taking a lower-paying job in order to avoid the payment of significant child support; also, potential income fairly allocates the support obligation "when one parent remarries and, *because of the income of the new spouse,*" chooses to be un- or underemployed. Child Supp.G. 3(A), cmt. 2(c) (emphasis added); *E.M.P.,* 722 N.E.2d at 351. "However, child support orders cannot be used to force parents to work to their full economic potential or make their career decisions based strictly upon the size of

potential paychecks." *E.M.P.*, 722 N.E.2d at 351–52. Also, there is no basis for determining that a parent is underemployed when the level of his or her earnings has remained relatively constant over a number of years. *See In Re Paternity of Buehler*, 576 N.E.2d 1354, 1356 (Ind.Ct. App.1991).

At the time of the modification hearing, Mother worked an average of thirty hours per week as a manager of a bookstore at a Florida garden, earning approximately $270.00 per week. She has a high school diploma, some college classes, and an Indiana real estate license that is not recognized in Florida. The trial court found Mother was underemployed based on her "education and training" and imputed $360.00 as her potential weekly income. This finding was insufficient to support the conclusion that Mother was underemployed for purposes of calculating her support obligation. Most importantly, there is no indication the trial court considered Mother's work history in making this determination, as is required by the Child Support Guidelines and case law. At a hearing the trial court did state that it did not "really know that much about Mrs. Siegel's employment history," and Father provided no such information to enlighten the trial court. Record p. 768. Because Father pressed the claim that Mother was underemployed, we believe it was his burden to present evidence on this point and specifically that her earned income has declined significantly over time, for whatever reason. *See Hamiter v. Torrence*, 717 N.E.2d 1249, 1252 (Ind.Ct.App.1999) (holding that each party bears the burden of justifying the incomes used in court-submitted child support worksheets). The record before us does not reveal the existence of such a decline. In fact, the 1992 divorce decree reveals that Mother was not employed outside the home at that time; thus, in 2000 she was making considerably more than when she was divorced from Father.

Additionally, Father does not claim that Mother is underemployed for the purpose of avoiding her child support obligations. He does point to the trial court's finding that Mother's current spouse contributes to her living expenses, but there is no dollar amount placed on this figure and no indication that these contributions were being imputed to Mother as income. Rather, the trial court ultimately concluded that these contributions led it to deviate from the amount of support recommended by the Guidelines, which is a separate issue from determining the amount of Mother's income. *See* Child Supp.G. 3(F) (deviation from guideline amount, if any, is determined *after* multiplying each parent's percentage share of total weekly adjusted income times the Total Child Support Obligation). There is no suggestion that Mother has chosen her current job and/or lowered her earnings *because of* her new spouse's income. Thus, because child support orders cannot be used to force persons to work to their full economic potential, there is no basis in the record for a finding that Mother is underemployed, even if she could theoretically earn more than she currently is earning. The proper legal standard for determining voluntary "underemployment," including consideration of a parent's work history and the reasons behind his or her current employment choice, was not applied here.

### B. Use of IRA "income" to Calculate Mother's Support Obligation

Mother vigorously argues that the trial court erred when it imputed annual income to her of $20,440, based on an annual rate of return of seven percent on IRAs valued in May 2000 at $584,000, and after assuming taxation and penalties equaling fifty percent of any withdrawal she would make

from these accounts. First, she claims improper inconsistency in calculating child support, because in prior support proceedings between the parties this "income" was never imputed to her. Second, she claims that because the dividends, interest, and other earnings on the accounts are automatically reinvested they do not constitute income to her. We agree.

We have previously held, for the purpose of determining whether there was a substantial change in circumstances justifying the modification of a child support obligation, that it is improper for a trial court to use inconsistent formulas from one proceeding to the next in calculating an obligor's available income. *See In Re Marriage of Wiley*, 444 N.E.2d 315, 318 (Ind.Ct.App.1983). The parties in this case were divorced in 1992. At that time, for purposes of child support, no income was imputed to Mother from the IRAs that were provided to her in the divorce decree. The issue of child support was revisited in 1996 and 1997; again, no income was imputed to Mother from the IRAs that she possessed. Father argues that the trial court was permitted to impute income from the IRAs following his 1999 modification petition, notwithstanding *Wiley*'s holding, because the change in circumstances supporting the petition was the greatly increased cost of R.S.'s schooling, not any alleged increase in Mother's income, as was the case in *Wiley*. Mother

responds by invoking the doctrine of judicial estoppel, which prevents a party from assuming a position in a legal proceeding inconsistent with one previously asserted, if a court acted upon the admissions of the party to be estopped. *Ohning v. Driskill*, 739 N.E.2d 161, 163 (Ind.Ct.App.2000), *trans. denied*. It does strike us as inconsistent for Father to treat Mother's IRAs as essentially a non-income producing asset for eight years and no less than three child support determinations, which position the trial court relied upon in approving the parties' support obligations, and later insist that the IRAs' annual returns should be counted as income.

Even without this inconsistency in Father's positions, we believe the trial court erred in imputing this income. The question of whether and to what extent the annual return on a specified retirement account may be included in a parent's income for purposes of calculating his or her child support obligation appears to be one of first impression in Indiana. This is a question of law that we will review de novo. We appreciate the trial court's attempt to resolve this issue and acknowledge that some jurisdictions have concluded that IRA "earnings" may be counted as income for child support purposes. *See Dunn v. Dunn*, 952 P.2d 268, 272 (Alaska 1998); *Tessmer v. Tessmer*, 903 P.2d 1194, 1196 (Colo.Ct.App.1995).[1] However, at

---

1. Father also cited the case of *Beckwitt v. Beckwitt*, 1992 WL 884700 (Va. Cir. Ct.), to the trial court, which relied heavily on it. It was, however, overturned by *Beckwitt v. Beckwitt*, 1993 WL 381451 (Va.Ct.App.), on a different issue that precluded the Virginia Court of Appeals' resolution of the issue of imputing income from an IRA's annual returns. Additionally, "just as it is inappropriate to cite memorandum decisions of this court as precedent ... it is similarly inappropriate to cite trial court decisions." *Indiana Dept. of Natural Resources v. United Minerals, Inc.*, 686 N.E.2d 851, 857 n. 1 (Ind.Ct.App.1997). The

trial court also cited *In re Marriage of Will*, 602 N.W.2d 202 (Iowa Ct.App.1999), which held "There is no direction in the child support guidelines for including deferred income as income for the purpose of applying the child support guidelines" but that such income may justify an upward deviation from the amount of support recommended by the guidelines. *Id.* at 206. We have no disagreement with that holding, as the parties' total financial resources may be considered in determining a support obligation, as we discuss

least one court has held that IRA "earnings" are not properly included in the determination of a parent's gross income, at least where no withdrawals have been made from the account since its inception, because such earnings are not available to the parent. *Bullock v. Bullock,* 719 So.2d 113, 117 (La.Ct.App.1998). We agree with this view.

The Indiana Child Support Guidelines define "weekly gross income" as

actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon "in-kind" benefits. Weekly gross income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, workmen's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, prizes, and alimony or maintenance received from other marriages. Specifically excluded are benefits from means-tested public assistance programs, including, but not limited to Temporary Aid To Needy Families (TANF), Supplemental Security Income, and Food Stamps.

The reasoning of the Alaska and Colorado courts was essentially that because "interest" and "dividends" are expressly listed as "income," as in our Guidelines, the source and nature of "interest" and "dividends" is of no consequence, even if they are associated with and automatically reinvested in a tax-deferred IRA and the parent does not currently receive or use the interest and dividends.[2] *See Dunn,* 952 P.2d at 272; *Tessmer,* 903 P.2d at 1196. We believe a more detailed examination of our Guidelines and the nature of IRAs is warranted.

"Actual" is defined as "[e]xisting and *not merely potential* or possible ... Being, existing or acting *at the present moment; current.*" American Heritage Dictionary p. 14 (emphases added). There can be little doubt that only existing income should be counted when making child support calculations, without use of the modifier "actual." Also, "income" generally is defined as "[t]he money or other form of payment that one *receives,* usu. periodically, from employment, business, investments, royalties, gifts, and the like." Black's Unabridged Law Dictionary 766 (7th ed.1999) (emphasis added). We conclude that the phrase "actual income" as used in the Guidelines necessarily implies that the income be not only existing in fact but also currently received by the parent and available for his or her immediate use. This begs the question: are annual IRA returns currently received by a parent and available for his or her immediate use?

██ The fundamental intended purpose of the laws creating the IRA was to encourage saving in order to provide in-

---

later. However, that is a different issue from calculating the parties' gross income.

**2.** We note that the trial court here referred to the annual "interest" of Mother's IRAs. However, her CPA actually testified to the IRAs' annual returns, which would include interest, dividends, and stock appreciation. While "interest" and "dividends" are mentioned in our Guidelines as income, stock appreciation is not. In fact, "capital gains" are mentioned, which necessarily contemplates the sale or exchange of an asset before any income is realized. *See* Black's Unabridged Law Dictionary 201 (7th ed. 1999). Thus, even if interest and dividends attributable to an IRA are, strictly speaking, "income," the appreciation in value of stock that is not sold or exchanged is not.

come to a taxpayer during his or her retirement that will supplement Social Security and employer-provided pension plans. *See* Richard L. Kaplan, *Retirement Funding and the Curious Evolution of Individual Retirement Accounts*, 7 Elder L.J. 283, 284 (1999). In an attempt to ensure that IRA funds are available to finance an account holder's retirement, a ten percent penalty is imposed on withdrawals made before the holder is fifty-nine and one-half years old. *Id.* at 292. There is no absolute prohibition against making early withdrawals from an IRA for those who wish to do so and pay the penalty; moreover, several exceptions to the ten percent penalty have arisen in recent years, including withdrawals for first-time home purchases, college expenses, and medical expenses. *Id.* at 293. However, we believe that where, as here, the annual returns of a parent's IRA or IRAs are automatically reinvested and there is no indication that previous withdrawals from the IRA have been made to fund the parent's lifestyle choices or living expenses, those returns generally should not be considered "actual income" when calculating the parent's child support obligation. Such returns are not currently received by the parent nor immediately available for his or her use.

We disagree with the Colorado Court of Appeals' characterization of the nonwithdrawal of IRA returns as the "shielding" of income, which seems to imply an improper attempt to avoid child support obligations. *See Tessmer*, 903 P.2d at 1196. A parent who is less than fifty-nine and one-half years of age and does not make

withdrawals from an IRA whose existence predates any child support obligation is merely fulfilling the intended Congressional purpose of the IRA and is not acting improperly.[3] We are not persuaded by the Colorado Court of Appeals' argument that because certain forms of public assistance are expressly excluded from the definition of "weekly gross income," the failure to expressly exclude interest and dividends attributable to an IRA as well necessarily means they must be part of "weekly gross income."[4] *Id.* While the Guidelines' definition of "income" is admittedly not exclusive, it would have been simple for the Guideline drafters to state expressly that "weekly gross income" includes tax-deferred income, in addition to the numerous other definitions of "income." We conclude that IRA annual returns generally should not be considered "actual income" as that phrase is used in our Child Support Guidelines.

We do recognize that income that is not "actual" may nevertheless be imputed to a parent under certain circumstances. However, our review of the purposes underlying the imputing of income reveals that none of them is implicated here. First, we have already discussed the issue of "underemployment," which is not pertinent to this issue. Second, in-kind benefits a parent receives "that reduce his or her living expenses" may be imputed as income. Child Supp.G. 3(A), cmt. 2. The automatically reinvested annual returns on Mother's IRAs do not reduce her current living expenses. Finally, we believe equity and

---

3. Mother has apparently not made any contributions to the IRA since her divorce from Father. We note that any such contributions would have to come from a separate income source, which would arguably make the amount of the contribution includable in a parent's weekly gross income for support purposes *before* the contribution was made. We are also not being asked to consider here whether the annual returns from an IRA established and/or contributed to *after* a support obligation arises should be considered income.

4. The Colorado definition of "weekly gross income" for child support purposes is very similar to ours.

the powerful public policy behind the payment of child support may require the imputing of income in any situation where a parent is deliberately attempting to "hide" income in order to avoid making support payments. No such intentional misconduct or improper motives can be ascribed to Mother's sound economic decision not to withdraw funds from IRAs that were awarded to her as part of a marital property division.

We further note that Child Support Guideline 5 states, "These guidelines have been drafted in an attempt to comply with, and should be construed to conform with applicable federal statutes." Although this Guideline may have been written specifically with the "Family Support Act of 1988" and Title IV–D of the Social Security Act in mind, *see* Child Supp.G. 1, cmt., it highlights the fact that a state court child support order that expects a parent to make early withdrawals from an IRA that would not otherwise be made directly conflicts with a federal law that furthers a clear policy of encouraging saving for retirement by placing a substantial penalty on any such withdrawal. We reject as unpersuasive Father's argument that the trial court did not actually order Mother to withdraw funds from her IRA and that she could obtain the funds needed to pay the expected child support elsewhere; the trial court attributed this income to her IRAs and the natural, logical assumption is that the necessary funds would come from those accounts.

■ Our opinion should not be construed as prohibiting courts from considering retirement accounts as assets that are part of a parent's total financial situation, after separately calculating his or her gross income; such assets may be considered in determining whether the level of support recommended by the Guidelines, based on the parent's weekly gross in-come, should be strictly adhered to. However, we note that "the financial resources of *both parents* are relevant in child support modification determinations and should be included in the totality of circumstances to be considered in making an award." *Merrill v. Merrill,* 587 N.E.2d 188, 190 (Ind.Ct.App.1992) (emphasis added). Such resources may include real estate, investments, automobiles, and other personal possessions. *Id.* It seems to us inequitable to require Mother to "dip into" her IRAs to help fund R.S.'s education at Brehm, while not acknowledging among other things that Father, by his own testimony, purchased a vacation home for $230,000 to $250,000, *in cash,* in October 1999, after he filed his petition seeking child support from Mother and after R.S. had begun his schooling at Brehm.

We will also discuss the issue of the income of Mother's subsequent spouse, because the trial court's finding that he pays a substantial portion of Mother's expenses plays a large part in Father's argument that we affirm the child support award. Additionally, we perceive that this issue is likely to be raised again on remand and we will address it in the interest of judicial economy. *See Spears v. Brennan,* 745 N.E.2d 862, 876 (Ind.Ct.App.2001). Great care should be taken on remand if the trial court does decide to impute income to Mother based on her current economic situation.

First, the commentary to Child Support Guideline 3 states that although "[t]he income of the spouses of the parties is not included in Weekly Gross Income," "regular and continuing payments made by a ... subsequent spouse ... that *reduce* the parent's costs ... may be the basis for imputing income." (Emphasis added.) Second, we held in *Gilpin v. Gilpin,* 664 N.E.2d 766 (Ind.Ct.App.1996), that the trial court erred in not considering the fact

that the Mother's new husband contributed $1200 toward her monthly expenses of $2400, where those expenses included "mortgage payments on a house which she owned *prior to her remarriage*." *Id.* at 767 (emphasis added). *Gilpin* was cited by our supreme court in *Glass v. Oeder*, 716 N.E.2d 413 (Ind.1999), where it noted that the contribution of a subsequent spouse to a parent's home "presumably *frees up money* for the support of her [or his] children and is a proper fact that may be considered in calculating her [or his] income." *Id.* at 417 (emphasis added). Finally, one of the most basic considerations mandated by the Child Support Guidelines is maintaining the standard of living that children would have enjoyed if their parents' marriage had not been dissolved. Child Supp.G. 1; Ind.Code § 31–16–6–1(2).

■■■ We conclude that when a trial court chooses to impute income to a parent based upon expenses paid by his or her current spouse, there should be some consideration of the parent's historical expenses before remarriage and how much of *those* expenses have now been assumed by the current spouse. An apt illustration of this point is present in this case. Here, as part of the 1992 divorce decree, Father agreed to pay the mortgage on the residence where Mother was to live. In calculating Mother's income for child support purposes, it would have been improper to impute Father's mortgage payments on Mother's behalf as income, even though it provided an in-kind benefit of free housing to her, because it would constitute double consideration of Father's income up to the amount of the mortgage payment, and it would thus represent an artificially increased standard of living that the children would not have enjoyed had the parents remained married. Likewise, to impute the full fifty percent of the mortgage pay-

ments of Mother's current spouse as income to her, assuming as the record indicates that she has never paid for housing before and such payments were made by Father prior to her remarriage, would represent an artificial inflation of Mother's income, because it would essentially create a standard of living based on Mother's being married both to her current husband and to Father at the same time, which is not the intention of the Child Support Guidelines and the relevant statutes.

If there were expenses being paid by Mother prior to her remarriage that are now being paid by her current husband, that benefit may be considered. In that instance, Mother's remarriage has in fact "freed up" money for child support that was not previously available, and such payments may be imputed as income because they have *reduced* Mother's cost of living from what it was before remarriage.

### C. Failure to Account for Mother's After-born Child

■ Child Support Guideline 3(A)(4) states: "In determining a support order, there should be an adjustment to Weekly Gross Income of parents who have natural or legally adopted children living in their households, and who were born or adopted subsequent to the prior support order." Here, with her subsequent husband Mother has had a child who was born after her divorce from Father. However, the trial court's findings and conclusions do not mention this fact and thus it did not adjust Mother's weekly gross income accordingly. Father concedes that the Guidelines mandate a reduction in weekly gross income in such a situation, but claims the trial court's error in not doing so here was harmless "in view of the conservative manner the trial court calculated support in other parts of Debra's income." Appellee's Brief p. 13. In view of our previous conclusions that Mother's income was erroneously cal-

culated, we direct the trial court on remand to consider Mother's child with her current spouse when it recalculates her weekly gross income.

### D. Calculation of Father's Income

Mother advances two reasons for her claim that the trial court erred in calculating Father's income at $2065 per week. First, she asserts that because the trial court considered the annual returns of her IRAs as "income," it was inequitable to not consider the appreciation in value of Father's assets, such as his real estate holdings, as income to him. Because we have already concluded that the trial court erred in imputing income to Mother based on the projected annual return of the IRAs, this argument is rendered moot.

Second, Mother claims the trial court should have imputed an additional $800 per week in income to Father, which represents the approximate drop in income he claims to have sustained as a result of his suspension from the practice of law. Mother claimed at trial that Father is underemployed,[5] and she now analogizes his situation to one where a parent has been convicted of a criminal act and that conviction or that act itself has resulted in a drop in the parent's income. In such cases we have refused to permit an abatement in the parent's child support obligation. *See Holsapple v. Herron*, 649 N.E.2d 140 (Ind.Ct.App.1995). Father responds that *Holsapple* and other similar cases cited by Mother are inapposite, because he is not requesting an abatement of support, he has not been convicted of a criminal act, and he did not request a modification of support because of his suspension from the practice of law and resulting alleged drop in income.

We agree that Father has not been convicted of a criminal act. Also, we will assume that the sole change of circumstances claimed in support of Father's petition to modify Mother's support obligation was the greatly increased cost of R.S.'s schooling, even though the petition was filed after our supreme court handed down Father's nine-month suspension from practicing law. However, we do not accept that Father did not receive an abatement of a support obligation because of his allegedly reduced income. When making child support calculations, the weekly gross income "must be calculated for *both* parents." Child Supp.G. 3(A), cmt. 2 (emphasis added). Then, *"[e]ach parent's child support obligation is determined by multiplying his or her percentage share of total weekly adjusted income ... times the Total Child Support Obligation."* Child Supp.G. 3(F) (emphasis added). "If one parent has custody, the amount calculated for that parent is presumed to be spent directly on the child." Child Supp.G. 1. Thus, merely because Father has primary physical custody of the children does *not* mean he does not owe a support obligation to them; he simply is presumed to spend the appropriate amount directly on the children. Any reduction in Father's income, therefore, necessarily results in an abatement or reduction in his child support obligation and a corresponding increase in Mother's, assuming her income has remained constant, though that reduction and corresponding increase is less obvious than in the case of a noncustodial parent who is ordered by a court to pay child support and who later requests an abatement.

Similarly, we believe that merely because Father sought an increase in Moth-

---

**5.** At the June 2000 hearing, Father testified that he intended to apply to have his license to practice law reinstated, but he apparently had not yet done so although he was eligible to in February 2000.

er's support obligation because of the cost of Brehm, it does nothing to alter the fact that his assumed support obligation *was* modified and reduced, and Mother's was increased, due to his suspension from the practice of law. Thus, Father cannot avoid the impact of cases holding that intentional misconduct provides no basis for a *modification* of child support simply by pointing to a separate, acceptable factor that justifies Mother's increased payment of support and by claiming that he himself did not seek a modification and reduction in his own obligation. He in fact did precisely that by claiming his income was $800 less per week than before his suspension.

■ In *Holsapple,* we held that

... when a criminal act or the resulting consequences therefrom is the primary cause of an obligor-parent's failure to pay child support, abatement of said obligation is not warranted. We held in *Davis v. Vance,* 574 N.E.2d 330, 331 (Ind.Ct.App.1991): 'It would be contrary to the Indiana Child Support Guidelines and to the very nature of our public policy favoring a child's security and maintenance to allow payments to abate based on a willful, unlawful act of the obligor.' In other words, Holsapple may not profit from his own criminal behavior.

*Id.* at 141–42. We are not aware of any Indiana case discussing whether a decrease in income caused by other intentional misconduct, aside from criminal activity, may warrant an abatement of child support. However, we perceive no reason to limit the rationale of *Holsapple* and *Davis* to only those cases where willful misconduct has resulted in a criminal conviction. Additionally, we find the view of the Ohio Court of Appeals to be persuasive. It has held that where an attorney engaged in intentional misconduct that resulted in his surrender of a license to practice law, the resulting drop in his income was "voluntary" and thus no modification of his child support obligation was warranted. *Brockmeier v. Brockmeier,* 91 Ohio App.3d 689, 693–94, 633 N.E.2d 584, 586–87 (1993). Similarly, we hold that if a parent's intentional misconduct directly results in a reduction of his or her income, no corresponding decrease in his or her child support obligation should follow, because such misconduct results in "voluntary underemployment" according to Child Support Guideline 3(A)(3), and the income the parent was earning before that misconduct should be imputed to that parent. On remand, the trial court should impute to Father the income that he was earning before he was suspended from practicing law, assuming his income *is,* in fact, less.[6]

6. Father testified in June 2000 that "I'm making about the same as I made practicing law working a lot less and I anticipate making more money on my real estate business," although ultimately his child support worksheets used an income figure $800 less per week than when he was practicing law. Record p. 463.

If, on remand, the trial court does conclude that Father is earning more than when he practiced law, it may wish to enter more complete findings on the sources of his weekly gross income. We observe that the present findings delineate the sources of Mother's income in some detail, but do not do so for Father's. It is unclear whether the trial court

considered rental income generated by a property located on South Keystone Avenue in Indianapolis as current income to him, and there are several factual issues regarding this property that were not resolved by the findings and conclusions. Father asserts in his brief that the property is owned by Padrone, Inc., a corporation of which he is a minority shareholder, and any income generated by the property would only serve to increase the value of his stock and thus should not be considered current income to him. However, Father testified at the hearing that "*I* own twenty five percent (25%) of the building and the land." Record p. 499–500 (emphasis added). Additionally, Father's 1997 income tax

### E. Mother's Liability for R.S.'s Private School Education

■ Mother does not argue on appeal that it is not in R.S.'s best interest to attend Brehm Preparatory School. In fact, she testified during the modification hearing that although she was troubled by Brehm's large expense, she agreed it was currently in his best interest to go there. Also, she expressed her willingness to pay $3000 per year for R.S.'s education. Now, however, Mother argues that she should not be liable for any portion of R.S.'s educational costs at Brehm, because Father failed to pursue the possibility of requiring the Carmel school district to pay for that education pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. Though we find her argument intriguing, we do not believe this issue is properly before us. A party cannot change its theory and on appeal argue an issue that was not properly presented to the trial court. *Franklin Bank & Trust Co. v. Mithoefer,* 563 N.E.2d 551, 553 (Ind.1990). Mother essentially claims in her reply brief that her IDEA argument is simply a permissible expansion on the arguments presented to the trial court regarding Brehm's costs and her liability for them. However, we believe that Mother's argument that she should not be liable for any of Brehm's cost because of IDEA is vastly and substantively different from her trial court arguments as to the proper amount of her liability, and it directly conflicts with her expressed desire to contribute several thousand dollars per year towards R.S.'s education.

■ The remainder of Mother's argument on this point is that the trial court did not roughly apportion the cost of R.S.'s Brehm education between Mother and Father, because it overstated Mother's income and understated Father's. In fact, the trial court did believe it was roughly apportioning the cost, and we agree that the requirement of "rough proportionality," based on the parties' respective incomes and financial resources, when allocating the costs of post-secondary education is also applicable when allocating the costs of other non-collegiate extraordinary educational expenses. *See Carr v. Carr,* 600 N.E.2d 943, 946 (Ind.1992). We have already discussed the issue of Mother's and Father's respective incomes and financial situations, and we also direct the trial court to revisit the issue of apportioning the cost of Brehm Preparatory School after it is has reconsidered the issue of Mother's ordinary child support obligation in accordance with this opinion.

### III. Change in Legal Custody

■ Mother's next claim is that the trial court erred in granting sole legal custody of R.S. and S.S. to Father. To reverse the trial court on this issue would require us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. There is sufficient evidence in the record to support the findings regarding sole legal custody, particularly

---

return lists Padrone as a partnership, not a corporation. Partnership income is subject to distribution among the partners entitled to receive it. *Hammes v. Frank,* 579 N.E.2d 1348, 1355 (Ind.Ct.App.1991), *trans. dismissed.* Also, we are not persuaded that this rental income cannot be considered in calculating Father's percentage of the support obligation merely because it is used to pay the mortgage secured by the property. *See Merrill v. Merrill,* 587 N.E.2d 188, 190 (Ind.Ct. App.1992). Father also notes that Mother was unable to provide the dollar amount of the rent payment. However, this may be because the property was not listed in Father's answer to Mother's interrogatory requesting information on his rental properties.

with respect to the parties' communication difficulties.

 One of the key factors to consider when determining whether joint legal custody is appropriate is "whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare." Ind.Code § 31–17–2–15(2). Also, we have held that "if the parties have made child-rearing a battleground, then joint custody is not appropriate." *Periquet–Febres v. Febres,* 659 N.E.2d 602, 605 (Ind.Ct.App.1995). A trial court may modify a custody arrangement if there is a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable. *Lamb v. Wenning,* 600 N.E.2d 96, 98 (Ind.1992).[7] The hostility between the parents in this case is all too plain, given the testimony of both Mother and Father, and it cannot be seriously disputed that joint legal custody of the children is no longer reasonable because child-rearing has become a battleground. The question before us, therefore, is did the trial court err in determining that sole legal custody of R.S. and S.S. should be with Father instead of Mother, which would also necessarily require a change in physical custody? In answering this question, we remember that with respect to legal custody, the welfare of the children, not the wishes and desires of the parents, is the primary concern of the courts. *Id.* at 99. Also, with respect to physical custody, a noncustodial parent must show some-

thing more than isolated acts of misconduct by the custodial parent to warrant a modification of child custody; he or she must show that changed circumstances regarding the custodial parent's stability and the child's well-being are substantial. *Wallin v. Wallin,* 668 N.E.2d 259, 261 (Ind.Ct.App.1996).

We acknowledge that the record reveals some evidence that Father has not always acted in the most cooperative fashion with respect to the welfare of his children and communication with Mother. There was also evidence of communication difficulties stemming from Mother, however, and we consider only the evidence most favorable to the judgment. *Oil Supply Co., Inc. v. Hires Parts Service, Inc.,* 726 N.E.2d 246, 248 (Ind.2000). Father testified that Mother has had very infrequent contact with S.S., speaking to him less than once a month, and that she was also unaware of any of S.S.'s activities. He also cited a lack of trust and communication in their (Father's and Mother's) relationship. A reasonable inference from such testimony, because it was given by Father, was that the communication and trust problems stemmed at least as much from Mother as from him.

Mother points to her testimony that tends to place much of the blame for the communication and trust problems on Father. We believe that the issue of who was being uncooperative with whom was a very fact-sensitive determination, neces-

---

7. This standard for the modification of custody orders generally was altered by statute, effective July 1, 1994. *See Wallin v. Wallin,* 668 N.E.2d 259, 260 (Ind.Ct.App.1996). Indiana Code Section 31–17–2–21 now provides that a custody order may be modified only if such modification is in the best interests of the child and there is a substantial change in one or more of the factors listed in Indiana Code Section 31–17–2–8 or 8.5. However, when considering the appropriate-

ness of joint *legal* custody, the relevant factors are listed in Indiana Code Section 31–17–2–15, not sections 8 or 8.5, which are relevant to *physical* custody determinations. Thus, strictly speaking, the standard for modifying custody in section 31–17–2–21 does not apply to modifications that affect legal custody only. We will apply the *Lamb* standard here in considering the appropriateness of changing a joint legal custody arrangement to sole legal custody.

sarily requiring the weighing of evidence and judging the credibility of witnesses, functions that rested exclusively with the trial court. In this respect, the present case differs from *Pierce v. Pierce*, 620 N.E.2d 726 (Ind.Ct.App.1993), cited by Mother. There, the trial court specifically found the father, the physical custodian, had failed to cooperate in executing joint legal custody, and we held this factual finding supported granting sole legal custody to mother. *Id.* at 731. There is no equivalent fact finding here.

■ Assuming both parties were being uncooperative with each other, it was entirely proper for the trial court to consider the fact that the children had lived in Indiana with Father ever since Mother moved to Florida as a "tie-breaker," for the ultimate consideration in making a custody determination is the welfare of the children, not the interests of the parents. *Lamb*, 600 N.E.2d at 99. Continuity and stability in the life of children is an important component in determining the proper custodial arrangement for a child. *See Dwyer v. Wynkoop*, 684 N.E.2d 245, 248–49 (Ind.Ct.App.1997), *trans. denied.* Our supreme court has noted the detrimental effect that an out-of-state move could have on "an older child who has formed friendships, attends school, and participates in activities or sports, is involved in [religious activities], or enjoys the security of supportive relationships with nearby relatives or others in his community," and that concern is present in this case. *See Lamb*, 600 N.E.2d at 99.

■ We also agree with Father that Mother overemphasizes the trial court's statement at a December 1999 hearing, related to certain discovery and temporary visitation matters, that "I really think that you're both really nice people and that you have a reasonable view of what being a parent is about. . . ." Record p. 172. Even

two parents who are exceptional on an *individual* basis when it comes to raising their children should not be granted, or allowed to maintain, joint legal custody over the children if it has been demonstrated, as here, that those parents cannot work and communicate *together* to raise the children. *See* Ind.Code § 31–17–2–15(2). The issue in determining whether joint legal custody is appropriate is not the parties' respective parenting skills, but their ability to work together for the best interests of their children. The trial court here was placed in a position of choosing one parent over the other regarding legal custody, because of their inability to communicate and work together, and we cannot say it was clearly erroneous to choose Father.

### IV. Visitation

■ Mother's first complaint regarding the visitation order, particularly with regard to S.S., is that it is entirely based upon the report of a Dr. David Tarr, who was ordered to evaluate S.S., yet the report was never introduced into evidence. We have searched the record and have found no indication that Dr. Tarr's report, although referred to several times by the parties and the trial court, was ever introduced into evidence. The burden of going forward with evidence justifying a restriction or intrusion upon a parent's visitation rights rests with the party seeking the restriction or intrusion—here, Father. *See In re Marriage of Davidson*, 540 N.E.2d 641, 650 (Ind.Ct.App.1989). Also, it has been said that a judgment cannot rest on evidence that was never adduced in court. 49 C.J.S. Judgments, § 48 p. 110 (1997). It may seem to be a mere "technicality" and an inadvertent oversight that this report was never introduced into evidence. However, this report apparently formed the sole basis of the trial court's

restricted visitation order. Although the parties may have been aware of the particular details of this report, we are not. A conclusory summary of Dr. Tarr's recommendations was introduced into evidence, but that provides no factual basis for the recommendations. Thus, our appellate judicial review function is severely hampered and it is impossible to examine this question properly when the report upon which the visitation order was based was never introduced into evidence and, therefore, is not included in the record of proceedings.

■ We observe in any event that Indiana Code Section 31–17–4–2 states that when modifying existing visitation rights of a noncustodial parent, a "court shall not restrict a parent's visitation rights unless the court finds that the visitation might endanger the child's physical health or significantly impair the child's emotional development." Mother's visitation rights with S.S. were severely restricted, as she was forbidden from visiting him at all until Dr. Tarr gave his approval for such visitation. However, there was no finding regarding endangerment to S.S.'s physical or emotional health and development. We might assume the report contains evidence that is decidedly unfavorable to Mother, given Dr. Tarr's ultimate recommendations, but we would be uncomfortable affirming the trial court's blanket adoption of these very strict visitation recommendations "sight unseen" as it were—without being able to review the report and the facts cited in support of those recommendations. Although the trial court's findings refer to the "poor" or "damaged" relationship between Mother and S.S., record pp. 110, 112, we cannot confidently hold, without reading Dr. Tarr's report, that this is a sufficient indicator that any visitation will "significantly impair" S.S.'s emotional development or physically threaten him. Nor is there any indication as to why Mother could not, at the very least, have *supervised* visitation with S.S. pending her completion of the recommended therapy, rather than taking the rather drastic step of denying her visitation completely. "[P]arents cannot be deprived of *all* visitation with their children merely because *some* danger exists. The *level* of danger must be examined and appropriate precautions taken." *Stewart v. Stewart,* 521 N.E.2d 956, 965 (Ind.Ct. App.1988) (emphases added), *trans. denied.* We remand for further consideration and the issuance of a visitation order that relies upon evidence subject to judicial review. There is also no finding as to why sixty days' advance notice is required for any visitation with either R.S. or S.S. This also needs to be further considered and supported on remand.

Finally, Mother argues, and Father concedes, that it was erroneous to leave the future decision as to when and if Mother could have visitation with S.S. solely to Dr. Tarr's discretion. We agree. A court may not delegate decisions regarding the frequency and availability of visitation to other parties, for "to do so would be to undermine the safeguards inherent in reserving to a detached and impartial court the task of weighing the many considerations relevant to visitation." *In Re the Paternity of A.R.R.,* 634 N.E.2d 786, 789 (Ind.Ct.App.1994). Whatever the trial court may decide on remand, the ultimate decisions regarding Mother's visitation with S.S. cannot be left to Dr. Tarr or any other person or authority aside from the court itself.

### V. Contempt

■ Finally, Mother asserts the trial court should have found Father in contempt for failing to purchase a suit for S.S. to wear to a bar mitzvah, in contradiction of an alleged court order. She directs us to the following testimony by Father:

Q: In April [2000] the Court issued an order that you were to allow [S.S.] to accompany his mother for the weekend. They were going to attend a bar mitzvah and there was a specific order for you to go buy clothing and toiletries for [S.S.] and you didn't do that, did you?

A: No.

 * * * * * *

Q: And you deliberately violated the Court's order.

A: I violated the Court's order.... I admit it. I admit that I violated that Court order.... I guess I was angry so I admit that I am not a perfect person. That I was angry, okay, and I did violate that particular court order. I didn't deny her the visitation but I certainly didn't send her with clothes.

Record p. 519–20. This issue presents us with problems. First, the trial court offered no explanation in its findings and conclusions as to why Father was not found to be in contempt. Second, we cannot find the alleged court order that Father admitted violating.[8] We have not been cited, nor have we found, any cases where a party admits in open court to violating a court order but no copy of the purported order is in the record.[9]

We conclude the paucity of findings on this issue requires us to remand. The purpose of findings of fact and conclusions of law is to provide the parties and reviewing courts with the theory upon which the case was decided. *F.E.H., Jr. v. State*, 715 N.E.2d 1272, 1275 (Ind.Ct.App.1999). The trial court's bare statement that Father is not in contempt of any court orders leaves us to wonder how and why it reached this conclusion in light of Father's testimony that he did willfully disobey an order. Mother admittedly did not introduce a copy of the order at issue into evidence, but a trial court is presumed to judicially know its own records that are part of the case presently before it. *See Brown v. State*, 458 N.E.2d 245, 250 (Ind.Ct.App. 1983). Father posits various reasons why the trial court may have decided not to find him in contempt, in spite of his admission, including the possibility that the order did not actually exist, that Father did not receive adequate notice of the allegedly violated order or the contempt petition, or that the original order was unlawful, possibly because it resulted from an ex parte communication with Mother's counsel. However, while it is true that when findings and conclusions are entered we may affirm the judgment on any theory supported by the findings, *see Albright v. Bogue*, 736 N.E.2d 782, 789 (Ind.Ct.App. 2000), the sole conclusory finding here regarding the contempt issue cannot support any of Father's proposed theories. We remand to the trial court for further consideration and explanation of its conclusion on the contempt issue.

### Conclusion

We reverse the trial court's determination of the amount of Mother's ordinary

---

8. We were only able to find a February 2000 letter from Mother's attorney to Father, requesting that he provide a suit for the bar mitzvah, and Father's statement to the trial court at a March 21, 2000 hearing that if visitation for the weekend at issue was granted, "[S.S.] will be appropriately dressed for the bar mitzvah, Judge. I would never put my son in an embarrassing position where he would be made to look foolish." Record p. 198.

9. We have previously held that an in-court admission of violating a court order because of frustration with the judicial system obviates strict compliance with all of the statutory requirements for indirect contempt petitions. *See Smoot v. Smoot*, 604 N.E.2d 618, 625 (Ind.Ct.App.1992), *trans. denied*.

child support obligation for S.S. and R.S., as well as the level of her liability for R.S.'s extraordinary educational expenses, and remand for further proceedings consistent with this opinion. We also remand for further consideration of and findings regarding the visitation and contempt issues. In light of the applicable standard of review, we affirm the trial court's granting of sole legal custody of S.S. and R.S. to Father.

Affirmed in part, reversed in part, and remanded.

DARDEN, J., and NAJAM, J., concur.