**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 31 2012, 8:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JAIMIE L. CAIRNS**
Ruppert & Schaefer, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**DEBORAH M. AGARD**
Law Office of Deborah M. Agard
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | |
| | ) | |
| ALEXANDER NIKOLAYEV, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1108-DR-393 |
| | ) | |
| NATALIA NIKOLAYEV, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Cynthia Ayres, Judge
The Honorable Deborah Shook, Master Commissioner
Cause No. 49D04-0901-DR-2720

**May 31, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Alexander Nikolayev appeals the trial court's child support and property division order in the dissolution of his marriage to Natalia Nikolayev. We affirm in part, reverse in part, and remand.

**Issues**

Alexander raises a total of ten issues and Natalia raises one issue on cross-appeal, which we combine and restate as the following:

    I.      whether the trial court's dissolution order constituted an appealable final judgment;

    II.     whether the trial court erred in its calculation of the child support obligation Alexander owes Natalia; and

    III.    whether the trial court erred in its division of the marital property.

**Facts**

Alexander and Natalia were married in November 2001, and they had one child during the marriage, V.N., who was born in 2003. Alexander, who has a Master's Degree in science from the former Soviet Union, immigrated to the United States from Russia in 1992. He began working for a pharmaceutical company within a few months of arriving in America. In 2002, he secured employment with Eli Lilly & Company ("Lilly") and currently earns over $100,000 per year, including bonuses.

Natalia has degrees from Russia in art restoration and art history. Before coming to America, Natalia worked as a conservator at the prestigious Russian Museum in St.

Petersburg, where she earned the equivalent of $200 per month. During the marriage, Natalia worked for six months at McDonalds but never had any other regular, full-time employment. She has attempted, unsuccessfully, to obtain employment at the Indianapolis Museum of Art. Currently, Natalia is attempting to establish an art restoration business in Indianapolis.

Alexander and Natalia met through a website for foreign brides. Shortly before Natalia came to America and married Alexander, she purchased a 1/6th interest in a one-room (not one-bedroom) flat in St. Petersburg for $16,000. The remaining 5/6th interests were owned by Natalia's son from a previous marriage and her sister. Natalia still retains that interest, which she valued at $8,333 in July 2010. Natalia had no other significant assets at the time of the marriage. Alexander, meanwhile, utilized funds that he brought into the marriage for a down payment of $37,200 on the marital residence.

At the end of 2008, Natalia moved out of the marital residence. She used $7,000 to $8,000 she had received from recent art restoration work she had done, along with some funds received from her older son and sister, to establish a separate household, including renting an apartment and buying furniture, utensils, and linens. Natalia also used some of the money to pay a consultation and retainer fee to an attorney for divorcing Alexander.

It appears that one of the primary motivations Natalia had for leaving Alexander was her belief that he was too controlling with respect to finances. For example, between 2002 and 2008, Alexander consistently received raises and bonuses from Lilly to the

3

point where he was earning over $100,000 annually. However, the available income to the Nikolayev family remained constant during this time, because Alexander directed that any additional amount earned through raises be saved and/or diverted to his voluntary 401(k) account through Lilly, and the money was not spent on current family expenses. By 2010, Alexander was contributing over $1,700 per month to his 401(k). The net effect of these 401(k) and savings contributions was that the amount available for current family expenses remained constant at approximately $51,000 per year throughout the marriage.

Alexander did not allow Natalia to have a credit card until near the end of the marriage, and even then he would review every expense she charged to it and would take the card away if he did not approve of it. According to Natalia, the marital home was sparsely furnished, they slept on a thin mattress on the floor for about a year after buying the home, and they had no cell phones, cable TV, or a washing machine; Natalia had to do laundry at a nearby apartment complex. Natalia indicated that Alexander had a "[S]oviet . . . mentality" towards finances that she did not believe was in V.N.'s best interests and said that Alexander's reluctance to spend any money on things like ice cream at the zoo or going out to eat made things "miserable." Tr. p. 243-44.

On January 20, 2009, Natalia filed her petition for dissolution. On February 6, 2009, the parties filed an agreed entry regarding provisional child custody and support. The agreement provided for joint physical and legal custody of V.N. Regarding child support, the agreement provided:

4

Husband will continue to pay child support voluntarily in the amount of $500.00 per month as he has started to do on December 19, 2008 . . . . He shall continue to pay all child care costs and carry health insurance on the child through his employer, Eli Lilly and Company. Further, he shall pay 100% of all out of pocket medical expenses and 100% of all educational expenses in public schools of Lawrence Township, Sunday Russian School tuition, books, and private lessons of Russian language. Further, he shall pay 75% of the cost of all clothing for the child. In the event that Husband receives an annual bonus from his employer he shall pay 20% of the net amount of the bonus into an educational fund established for the child.

App. p. 30.

The trial court conducted the first of two hearings on the dissolution on July 21, 2010. Alexander represented himself at this hearing. At the outset, the parties stipulated that joint physical and legal custody of V.N. should be continued. The parties also stipulated that as of the date of separation, Alexander had a Lilly pension currently worth $80,373 and that his 401(k) account was worth $82,920.[1] During this hearing, Natalia requested that Alexander be required to pay $198 per week in child support and that she be named the custodial parent of V.N. for purposes of controlled expenses and assignment of the parenting time credit. However, Natalia did not submit a child support worksheet into evidence at this hearing. Natalia also submitted a proposed division of assets that valued her interest in the St. Petersburg flat at $8,333 but set aside that property solely to her, with the remaining marital assets to be divided 60/40 in her favor.

---

[1] On appeal, Natalia asserts that the Lilly pension was expected to pay Alexander $6,954.12 per month when he retired, based on its value at the time of separation. It is clear, after reviewing the documentation for this pension, that it would pay $6,954.12 per year, not per month.

5

The parties failed to complete their presentation of evidence at this hearing, with the trial court strongly advising Alexander to obtain counsel before the next hearing.

Before the next hearing was held, Natalia moved to modify the provisional order regarding custody and support of V.N. so that she would have primary custody of him, largely because of Alexander's alleged failure to communicate regarding V.N.'s care. However, Natalia later dismissed this motion because she believed that communication had improved.

The trial court conducted a second hearing on the dissolution on February 17, 2011, with Alexander now represented by counsel. During the hearing, Alexander attempted to present evidence regarding what his child support obligation would have been in the provisional order if it had been calculated in accordance with the Child Support Guidelines. The trial court did not allow Alexander to present any such evidence, stating, "we're not going to relitigate what went on in 2009." Tr. p. 155.

Alexander also argued that his current support obligation should not be based on any bonus income he may receive, and also that his income should be calculated only after deducting the 401(k) contributions he had been regularly making throughout the marriage. Alexander calculated his current income, less his contributions to his 401(k), at $1,595 per week. He also assigned income to Natalia of $484 per week. He reached this figure by assuming income of $35 per hour at seven hours per week as an art conservator/restorer, and thirty-three hours per week at minimum wage, or $7.25 per hour. He also wished to be named the custodial parent for purposes of controlled

6

expenses; the end result of Alexander's proposed child support worksheet was a weekly support obligation of $86.

Regarding property division, Alexander requested that the property be divided 54.6% to him, 45.7% to Natalia. He also attempted to admit into evidence a Russian document, translated into English, purporting to appraise the total value of the St. Petersburg flat at $146,000 in US dollars, but the trial court sustained Natalia's hearsay objection to the document. The trial court did permit Alexander to testify as to his belief that the flat was worth approximately $146,000, with Natalia's $1/6^{th}$ interest being worth $24,433.

On rebuttal, Natalia submitted a child support worksheet proposing that Alexander pay $210 per week in support, based on a weekly income of $2,268 for Alexander and $148 for Natalia and with Natalia being named the custodial parent in charge of controlled expenses. She testified as to the difficulty she was having in the current economy getting her business started, and stated that it would be difficult to hold a part-time job while also doing the work necessary to start a business. She also testified that her job allows her to take V.N. to appointments and the like, and that she should be in charge of controlled expenses for V.N. because of Alexander's over-reluctance to spend money.

On July 8, 2011, the trial court entered its dissolution order, with accompanying findings and conclusions per Alexander's request. For child support purposes, the trial court set Alexander's weekly income at $2,268, which included bonuses that the trial

court found he had "regularly received . . . each year." App. p. 12. For Natalia, it imputed income of $290 per week, or forty hours per week at minimum wage. It also named Natalia the custodial parent in charge of controlled expenses and assigned the parenting time credit to Alexander, resulting in a weekly support obligation of $186 per week. However, it also made this support obligation effective July 21, 2010, the date of the first dissolution hearing, which necessarily resulted in an arrearage in Alexander's obligation because he had been paying the provisional order's support obligation of $500 per month, plus expenses as delineated in that order. The trial court ordered Alexander to pay an additional $34 per week towards this arrearage, and directed that "Wife's attorney will calculate the arrearage effective the date of this Decree." Id. at 13.

Regarding the property division, it assigned a value to Natalia's interest in the St. Petersburg flat of $8,333, per her request. It also found that Alexander had household goods worth $1,000 and Natalia had such goods worth $300 at the time of separation. It concluded that based upon the disparate earning ability of the parties, it would award Natalia 60% of the martial estate and Alexander 40%. However, in its financial figures of the parties' assets subject to division, it excluded Natalia's $8,333 interest in the St. Petersburg flat before calculating the 60/40 split. Excluding the flat, the trial court found the net value of the marital estate to be $266,889.30, with Natalia to receive $160,133.58 total in assets and Alexander $106,755.72. With respect to the retirement accounts and as part of the total assets, the trial court awarded Alexander the full amount of his Lilly pension that he is due to receive upon retirement and awarded Natalia the value of the

8

401(k) at the time of separation, or $82,920. In order to effect the 60/40 split, the trial court ordered Alexander to make an equalization payment of $56,056,84. It also ordered him to pay $12,000 towards Natalia's attorney fees. Alexander now appeals.

**Analysis**

At Alexander's written request pursuant to Indiana Trial Rule 52(A), the trial court here entered findings of fact and conclusions thereon. Therefore, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. Carmichael v. Siegel, 754 N.E.2d 619, 625 (Ind. Ct. App. 2001). We defer to the trial court's proximity to the issues and will disturb a judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. Id. "We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment." Id. A party challenging a trial court's findings must establish that they are clearly erroneous. Id. Findings are clearly erroneous only when a review of the record leaves us firmly convinced a mistake has been made. Id. "However, while we defer substantially to findings of fact, we do not do so to conclusions of law." Id. A judgment also is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. Id. "We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions." Id.

We also note that we "give considerable deference to the findings of the trial court in family law matters . . . ." MacLafferty v. MacLafferty, 829 N.E.2d 938, 940 (Ind. 2005). Whether reviewing a case for "clear error" or "abuse of discretion," this

9

appellate deference is, first and foremost, a reflection that the trial court is in the best position to judge the facts, ascertain family dynamics, and judge witness credibility and the like. Id. at 940-41. "Secondly, appeals that change the results below are especially disruptive in the family law setting." Id. at 940. "But to the extent a ruling is based on an error of law or is not supported by the evidence, it is reversible, and the trial court has no discretion to reach the wrong result." Id. at 941.

### I. *Final Judgment*

Before turning to the merits of this appeal, we must first address Natalia's cross-appeal claim that the trial court's dissolution order was not a final appealable order, because it did not definitively resolve the amount of any child support arrearage that Alexander owed by virtue of the trial court making its support order retroactive. In Finding 16, the trial court found that Alexander had a support arrearage and stated, "Wife's attorney will calculate the arrearage effective the date of this Decree." App. p. 13. In Conclusion 9, the trial court stated, "Wife's attorney shall prepare an updated arrearage calculation effective the first Friday after this Decree." Id. at 20.

A "final judgment" is one that "disposes of all claims as to all parties[.]" Ind. Appellate R. 2(H)(1). Whether an order is a final judgment affects this court's subject matter jurisdiction. R.R.F. v. L.L.F., 956 N.E.2d 1135, 1139 (Ind. Ct. App. 2011). A lack of appellate subject matter jurisdiction may be raised at any time and if the parties do not raise the issue, this court may consider it sua sponte. Id.

10

Despite Natalia's claim to the contrary, we believe this case is indistinguishable from R.R.F. for all practical purposes. There, a trial court entered an order with respect to tax credits for post-secondary education expenses directing "Father to reimburse Mother 35.93% of any tax credit subsidy he receives and Mother to reimburse Father 64.07% of any tax credit subsidy she receives." R.R.F., 956 N.E.2d at 1138. On appeal, the State as intervenor claimed this order was not final because it left for future determination the specific dollar amount payable by either Mother or Father. We rejected this argument, noting that "the parties are ordered to undertake this course of action independently, without further intervention of the court." Id. at 1139. Thus, the trial court's order left nothing for future determination by it, making it an appealable final judgment. Id.

Here, likewise, the trial court's order leaves it solely within the province of Natalia's attorney to calculate the amount of arrearage that Alexander owed. There is no language in the order directing Natalia's attorney to submit the arrearage calculation to the trial court for approval.[2] As such, just as in R.R.F., the trial court's dissolution order left nothing for it to resolve, and the parties were ordered to resolve the arrearage calculation without further intervention of the court. The trial court's dissolution order was a final appealable judgment, and we have subject matter jurisdiction to entertain this appeal.

---

[2] Alexander asserts that this delegation of the arrearage calculation to Natalia's attorney was, by itself, error. We need not address that issue, given our resolution regarding the retroactive date of the support order.

11

## II.  Child Support

### A.  Retroactivity of Order

We first address Alexander's argument that the trial court erred in making the effective date of the dissolution decree's $186 per week child support obligation July 21, 2010, rather than the date of the decree itself, or July 8, 2011.  Although we can imagine that issues similar to this may often arise in divorce actions, there is surprisingly little guidance in the statutes or case law that address when a trial court can make a support obligation effective in a final dissolution decree.  Nevertheless, we conclude the trial court erred here.

First, Indiana Code Section 31-15-4-8(a) permits a trial court to "issue an order for temporary . . . support in such amounts and on such terms that are just and proper." Under Indiana Code Section 31-15-4-14, a provisional child support order terminates when "the final decree is entered subject to right of appeal . . . ."  In Trent v. Trent, 829 N.E.2d 81, 85-86 (Ind. Ct. App. 2005), this court held that a provisional child support order merges into the support order of a final dissolution decree and, furthermore, that a parent cannot seek to recover an arrearage under the provisional order unless the final dissolution decree specifically addresses such arrearage.  Here, although the trial court found there to be an "arrearage," there was no finding that Alexander had actually failed to comply with the provisional agreed entry regarding child support.

Natalia cites no authority for the proposition that a child support order in a dissolution decree can be made effective before the date of the decree itself, especially

when there was a provisional support decree that was already in effect. Nonetheless, Natalia contends that the trial court in fact modified the provisional support decree, effective July 21, 2010. Indiana Code Section 31-15-4-15 provides, "The terms of a provisional order may be revoked or modified before the final decree on a showing of the facts appropriate to revocation or modification." A request to modify a provisional support order need not be in writing and may be made orally. See L.D.H. v. K.A.H., 665 N.E.2d 43, 49 (Ind. Ct. App. 1996), abrogated on other grounds by Russell v. Russell, 682 N.E.2d 513 (Ind. 1997). In the context of final support orders, they may be modified retroactively to the date of the filing of a modification petition or any date thereafter. See Becker v. Becker, 902 N.E.2d 818, 820 (Ind. 2009). Still, we see no request in the record from Natalia, either orally or in writing, that the provisional agreed entry regarding child support be modified, or that the new child support order be made effective on a date prior to the final dissolution decree.[3]

Natalia contends that a modification of the provisional support order was impliedly litigated by the parties, because she presented evidence that that support order had been inadequate to meet her and V.N.'s needs. She notes that this court has held that even a final child support order may be modified in the absence of an explicit request that it be modified, if "the issue has actually been litigated (i.e., by introducing evidence in that regard) . . . ." O'Campo v. O'Campo, 597 N.E.2d 1314, 1316 (Ind. Ct. App. 1992). Regardless, it appears to us that the parties were at all times litigating the question of

---

[3] Natalia filed a motion to modify provisional custody of V.N., and with it a necessary change in support, but she withdrew that motion.

13

what the final child support order should be, not whether the provisional support order should be modified. Most importantly, the trial court expressly denied Alexander the opportunity to present evidence on what he believed should have been his temporary support obligation if it had been calculated in accordance with the Child Support Guidelines; it said, "we're not going to relitigate what went on in 2009." Tr. p. 155.

Clearly, there are important public policy considerations in ensuring that children are adequately provided for by their parents, but there also must be equitable considerations regarding notice and an opportunity to present evidence on the question of child support. Moreover, we are concerned that parties may be discouraged from entering into agreements regarding provisional child support if they are faced with the prospect of those agreements later being effectively over-ridden by a final dissolution decree and being held to be in arrears in support, in particular where no party made a request to modify the provisional support amount and there had been full compliance with the provisional order. Under the circumstances, we conclude there was no proper basis upon which the trial court could make Alexander's increased child support obligation retroactive to a date before the final dissolution decree was entered. We reverse the trial court's July 21, 2010 effective date of the final child support order, vacate the finding that Alexander owed a child support arrearage because of that effective date, and direct that the effective date of the final support obligation be July 8, 2011.

### B. Natalia's Income

14

Next, Alexander contends the trial court erred in assigning a weekly income of $290 to Natalia. Alexander claims her potential income is considerably higher than that. Although Natalia does not owe Alexander child support, an increase in her income likely would result in a net reduction in Alexander's support obligation after application of the Child Support Guidelines. "The starting point in determining the child support obligation of a parent is to calculate the weekly gross income for both parents." Meredith v. Meredith, 854 N.E.2d 942, 947 (Ind. Ct. App. 2006) (citing Ind. Child Support Guideline 3(A), cmt. 2). If a parent has no income or only means-tested income, potential income may be assigned to that parent if he or she is capable of earning an income, or more income than he or she is currently earning. Child Supp. G. 3(A), cmt. 2(c). The amount of potential income to be used is determined by considering the parent's potential and probable earnings level based on the his or her work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community. Meredith, 854 N.E.2d at 947 (citing Child Supp. G. 3(A)(3)). "[C]hild support orders cannot be used to force parents to work to their full economic potential or make their career decisions based strictly upon the size of potential paychecks."[4] Id.

---

[4] We note that there are usually two reasons cited for attributing potential income to a parent when making a child support calculation: (1) to discourage a parent from taking a lower paying job to avoid the payment of a significant amount of support, and (2) to fairly allocate the support obligation when one parent remarries and chooses not to be employed, because of the new spouse's income. Meredith, 854 N.E.2d at 947 (quoting Child Supp. G. 3, cmt. 2(c)). Neither of those factors is present here because Natalia is not paying support to Alexander and she has not remarried. Regardless, Natalia does not argue that it is entirely improper to assign potential income to her.

On appeal, Alexander argues three reasons why the amount of income the trial court attributed to Natalia is erroneous, but he presented only one of these three income calculations to the trial court. All of Alexander's proposed child support worksheets that he presented to the trial court, several of them, attributed income to Natalia of $484 per week; this figure was based on her working seven hours per week as a conservator at $35 per hour, and thirty-three hours per week at minimum wage of $7.25 per hour. Because the $484 figure is the only one Alexander argued to the trial court, he has waived his appellate arguments with respect to the other figures. See Heaphy v. Ogle, 896 N.E.2d 551, 557 (Ind. Ct. App. 2008) (noting general rule that failure to raise an issue before trial court results in waiver of that issue). We will address only the trial court's rejection of the $484 figure.

The trial court entered the following finding with respect to Natalia's income:

> Wife is highly trained and educated as a painting conservationist and works full time in that field. Wife's business is very slow right now, but she hopes to expand it after distribution of the property settlement following the entry of the dissolution decree. Wife contends her income at the present time is $148.00 per week. The Court attributes potential income to Wife as she is capable of earning $290.00 (or minimum wage) per week.

App. p. 12. This finding is supported by the evidence. The trial court obviously attempted to reach an equitable "middle road" between Alexander and Natalia's proposed income figures for her. We cannot say it clearly erred in doing so.

16

Natalia testified that she has attempted to secure a full-time art conservator position in Indianapolis but has been unable to do so. She stated that her Russian degrees are not well-regarded in the United States. Thus, although Natalia is indeed highly educated and skilled, that education and skill is in a field with very limited job opportunities, especially in this area. Natalia has worked very little since coming to the United States, with her work history until very recently consisting of a brief stint at McDonalds. Natalia also testified that her attempt to start her own art conservation business has been going slowly, at least in part because of the current economic climate. She also noted that it is difficult to put the time into starting her business, which may not pay very well at the moment, and also be asked to work another job in addition to her business. This is evidence that even if Natalia effectively works full-time at her business, she is not necessarily making a full-time income. She also observed that her current employment is flexible and allows her to take V.N. to appointments and such as needed.

This evidence reflects upon Natalia's potential and probable earnings level based on her work history, her occupational qualifications, the prevailing job opportunities in her field in the Indianapolis area, and earnings levels in the community. Such evidence also justifies the trial court's decision to settle upon an income figure for Natalia that is roughly halfway between the proposed incomes submitted by Alexander and Natalia. We also observe that the traditional reasons for assigning potential income to a parent are not present here. The trial court's determination of the amount of potential income to assign to Natalia is not clearly erroneous. If in fact Natalia's art restoration business later

17

becomes more successful and she begins earning substantially more income, Alexander may petition for a modification of child support.

### C. Treatment of Alexander's 401(k) Contributions

We now acknowledge Alexander's argument that the trial court apparently calculated his weekly income as including the large amounts he contributes to his 401(k) account at Lilly. At the second hearing below, Alexander presented substantial testimony, evidence, and argument that the trial court should exclude those 401(k) contributions from a calculation of his income for child support purposes because he made such contributions throughout the course of the marriage. He bases his argument on the general principle that a child support order should, at least in part, reflect "the standard of living the child would have enjoyed if . . . the marriage had not been dissolved . . . ." I.C. § 31-16-6-1(a)(2)(A). He also relies upon Saalfrank v. Saalfrank, 899 N.E.2d 671 (Ind. Ct. App. 2008), a case which he cited to the trial court. In that case, we listed a number of factors that a trial court should consider in determining whether to exclude retirement contributions from a parent's income for purposes of calculating a child support obligation, including:

> (1)    a parent's control of whether or in what amount a retirement contribution is made;
>
> (2)    the parents' established course of conduct in retirement planning (prior to and after the dissolution);
>
> (3)    the amount of the contribution (from nominal to a large amount that could suggest the inappropriate sheltering of income);

18

(4) whether and to what extent there are incentives for the contribution;

(5) whether the contribution qualifies for favorable tax treatment;

(6) whether continuing the contribution, in whole or in part, would otherwise reduce the amount that a child in the intact home could expect to receive; and

(7) any other relevant evidence.

Saalfrank, 899 N.E.2d at 680. Natalia argues that application of these factors, as well as public policy considerations, justify including Alexander's 401(k) contributions as part of his income for child support purposes.

Unfortunately, however, the trial court entered no findings whatsoever as to Alexander's 401(k) contributions. It would appear it decided to include them as part of Alexander's income, but there are no findings as to why it did so. "The purpose of special findings is to provide the parties and the reviewing court with the theory upon which the trial judge decided the case in order that the right of review for error may be effectively preserved." Carmichael v. Siegel, 670 N.E.2d 890, 891 (Ind. 1996). "When properly requested, a trial court is required to make complete special findings sufficient to disclose a valid basis under the issues for the legal result reached in the judgment." Fobar v. Vonderahe, 756 N.E.2d 512, 518 (Ind. Ct. App. 2001), summarily aff'd in relevant part, 771 N.E.2d 57, 60 (Ind. 2002). Given that Alexander requested special findings and that he also vigorously argued the issue of his 401(k) contributions to the

19

trial court, that court's silence on the issue is insufficient to meet the Trial Rule 52 standard. We must remand for the trial court to further consider this issue based on the current record and to enter findings that specifically address it. See id.

### D. Treatment of Alexander's Bonuses

Alexander also contends that the trial court erred in including bonuses he receives from Lilly in its calculation of his weekly gross income. Child Support Guideline 3(A)(1) states that "Weekly Gross Income" of a parent "includes income from any source . . . and includes, but is not limited to, income from salaries, wages, commissions, bonuses . . . ." The Commentary to this Guideline acknowledges that "irregular or nonguaranteed" income, including bonuses, may "cause difficulty in accurately determining the gross income of a party." Child Supp. G. 3, cmt. 2(b). Bonuses are "includable in the total income approach taken by the Guidelines," but its inclusion "is also very fact-sensitive." Id. "Care should be taken to set support based upon dependable income, while at the same time providing children with the support to which they are entitled." Id.

In considering this commentary, this court has held "that the decision to exclude overtime or bonus income centers around the dependability of such income. It is also clear that if the income is dependable, it should not be excluded without proper consideration." Thompson v. Thompson, 696 N.E.2d 80, 83 (Ind. Ct. App. 1998). Generally, "the trial court's discretion in excluding overtime and bonus income is grounded in a determination that the income is not dependable or would place a hardship

20

on a parent to maintain." Id. at 84. We also observe that although it generally is best to follow principles announced in the commentary to the Child Support Guidelines, it is the Guidelines themselves that are binding and not the commentary. See Matter of Paternity of T.W.C., 645 N.E.2d 1128, 1130 (Ind. Ct. App. 1995). The Guidelines clearly place bonuses within the general definition of "Weekly Gross Income."

Here, the trial court calculated Alexander's weekly gross income at $2,268, which also was the figure on Natalia's proposed child support worksheet. It is clear that this figure was based on a paystub for Alexander from November 30, 2010, which listed his year-to-date income as $108,886.06, which included a "Corporate Bonus Plan" payment of $15,629.16. Ex. I. Division of $108,886.06 by forty-eight weeks (through the end of November) results in $2,268.46. Although there is no evidence of the precise amount of any bonus that Alexander received in 2009, there was evidence that he reported income of $103,284, which necessarily must have included a sizable bonus. A paystub from 2008 revealed that he received a "Corporate Bonus Plan" payment of $21,136.24 that year. For 2008, Alexander's base salary appears to have been $88,451 (or $3,685.46 paid semi-monthly); by 2010, it was $102,912 (or $4,288.04 paid semi-monthly). In fact, Alexander's income increased steadily and substantially during the entire marriage and his employment by Lilly.

The trial court found that Alexander's bonuses would be included as part of his income "as they are a regular part of his income at Eli Lilly and Company from year to year." App. p. 12. Alexander does not directly argue that this is a clearly erroneous

finding, and we cannot say that it is. He notes that the bonuses are not guaranteed, and claims on appeal that Lilly "has, at best, rough waters before it." Appellant's Br. p. 27. This is mere speculation, however. There was no evidence presented before the trial court of any such "rough waters" or of a danger in Lilly suspending or significantly reducing the "Corporate Bonus Plan" that had contributed substantially to Alexander's income in 2008 through 2010, during which time his base salary also increased substantially. It would be entirely inappropriate for this court on appeal to attempt to determine Lilly's future financial strength.

As for the bonuses not being guaranteed, we also observe that no job or salary ever is guaranteed. Alexander's bonuses have been a substantial part of his income for several years. As such, it was "dependable" income and the trial court did not err in including it as part of his income, as based upon his most recent paystub. We also note that, given Alexander's steadily and significantly increasing income over the years, it was entirely appropriate for the trial court to base its calculation of his income on his most recent paystub, rather than an average of the past several years. See Schaeffer v. Schaeffer, 717 N.E.2d 915, 917-18 (Ind. Ct. App. 1999) (holding trial court abused its discretion in calculating father's income based on average of past five years, rather than most recent income, where income had been steadily and substantially increasing over those five years, despite father's argument that his income "fluctuates with the economy").

Alexander also argues that even if his bonus income should be considered for child support purposes, the trial court should have ordered that a fixed percentage of

22

whatever bonus he receives be contributed to a post-secondary educational fund set up for V.N., rather than including his bonus as part of his weekly gross income for purposes of calculating his weekly support obligation. In the past, Alexander had (and under the provisional support agreed entry) been contributing twenty percent of any bonus he received to this fund. Alexander directs us to another part of the commentary accompanying Child Support Guideline 3, which states:

> When the court determines that it is appropriate to include irregular income, an equitable method of treating such income may be to require the obligor to pay a fixed percentage of overtime, bonuses, etc., in child support on a periodic but predetermined basis (weekly, bi-weekly, monthly, quarterly) rather than by the process of determining the average of the irregular income by past history and including it in the obligor's gross income calculation.

Child Supp. G. 3, cmt. 2(b).

We reiterate that the commentary to the Guidelines is not binding. Even if it was, the fact that the commentary says a trial court "may" treat irregular income such as bonuses in this way indicates that a court has discretion to do so, not that it must do so. See Turner v. Franklin County Four Wheelers, Inc., 889 N.E.2d 903, 906 (Ind. Ct. App. 2008) (holding that the word "may" in a procedural rule indicates a permissive condition and discretion). Indeed, we have previously held that it is incorrect to assert "that income averaging cannot be used when an obligor's income, other than from self-employment, is subject to fluctuation." In re Paternity of G.R.G., 829 N.E.2d 114, 119 (Ind. Ct. App. 2005).

The bottom line is that a trial court has broad discretion in calculating a child support obligation, so long as it acts consistently with the Child Support Guidelines. See Quinn v. Threlkel, 858 N.E.2d 665, 670 (Ind. Ct. App. 2006). The trial court here did so act. Moreover, when two parents divorce, a court is the ultimate arbiter of their financial decisions regarding child support. Natalia believes now that it is more important that Alexander's bonuses be contributed towards current child support, not future post-secondary education. It was within the trial court's discretion under the Guidelines to side with Natalia on this issue and to include Alexander's bonuses for purposes of calculating his current child support obligation, rather than continuing the past practice of contributing a percentage of those bonuses to a college education fund. Whatever Alexander desired to do in the past is not controlling on the trial court when it comes to calculating his child support obligation. The trial court did not clearly err in its treatment of Alexander's bonus income.

### E. Assignment of Controlled Expenses

The final issue Alexander raises with respect to the child support order is the trial court's decision to name Natalia the custodial parent of V.N. for purposes of the assignment of controlled expenses to her and of the parenting time credit to Alexander. Commentary to the Guidelines explains:

> Controlled expenses are items like clothing, education, school books and supplies, ordinary uninsured health care and personal care. . . . The custodial parent controls this type of expense. . . . The parenting time credit is based on the more time the parents share, the more expenses are duplicated and

transferred. The controlled expenses are not shared and remain with the parent that does not get the parenting time credit. Controlled expenses are generally not a consideration unless there is equal parenting time. <u>These categories of expenses are not pertinent for litigation</u>. They are presented only to explain the factors used in developing the parenting time credit formula.

Child Supp. G. 6, cmt. (emphasis added).

Alexander contends the trial court failed to issue any findings indicating it followed this commentary regarding controlled expenses in a joint custody situation:

> When both parents equally share parenting time, the court must determine which parent will pay the controlled expenses. If, for example, father is the parent paying controlled expenses, the parenting time credit will be awarded to the mother.
>
> Factors courts should use in assigning the controlled expenses to a particular parent include the following areas of inquiry:
> --Which parent has traditionally paid these expenses.
> --Which parent is more likely to be able to readily pay the controlled expenses.
> --Which parent more frequently takes the child to the health care provider.
> --Which parent has traditionally been more involved in the child's school activities (since much of the controlled expenses concern school costs, such as clothes, fees, supplies, and books).

<u>Id.</u> Alexander contends that consideration of these factors should have led to him being assigned the parent to pay controlled expenses for V.N.

Missing from Alexander's brief, however, is any discussion of how the trial court's assignment of controlled expenses negatively affected him or the calculation of his child support obligation. We will not undertake to speculate what such an effect

might be or presume that Alexander was prejudiced. See Knotts v. Knotts, 693 N.E.2d 962, 967 (Ind. Ct. App. 1998) (declining to find error in child support calculation where parent failed to argue how alleged discrepancy in income figures impacted her support obligation), trans. denied. In other words, we are not going to attempt to recalculate Alexander's child support obligation for him and determine the impact of switching of the controlled expenses. It is axiomatic that in order to prevail on appeal, a party must make a showing of prejudice. Cox v. Anderson, 801 N.E.2d 775, 779 (Ind. Ct. App. 2004). Additionally, the commentary to the Guidelines clearly state that controlled expenses should not be a subject for litigation. Indeed, Alexander does not cite, nor has our research uncovered, any reported Indiana case that has ever discussed alleged error in the assignment of controlled expenses. In the absence of any allegation of prejudice on this issue, we decline to reverse the trial court's assignment of controlled expenses to Natalia.

### III. Property Division

### A. St. Petersburg Flat

Turning now to the division of the parties' property, we first address Alexander's contention that the trial court erred in excluding Natalia's interest in the St. Petersburg flat from the marital estate subject to division. Indiana Code Section 31-15-7-4(a) provides:

> (a)     In an action for dissolution of marriage under IC 31-15-2-2, the court shall divide the property of the parties, whether:

(1)     owned by either spouse before the marriage;

(2)     acquired by either spouse in his or her own right:

   (A)     after the marriage; and

   (B)     before final separation of the parties; or

(3)     acquired by their joint efforts.

Additionally, the value of a spouse's interest in property owned jointly with unrelated third parties must also be included in the marital pot subject to division, as long as the spouse has a present interest of possessory value in the asset. See Grathwohl v. Garrity, 871 N.E.2d 297, 301 (Ind. Ct. App. 2007).

The trial court entered the following finding regarding the St. Petersburg flat:

> Wife owned her interest in the flat in St. Petersburg prior to the marriage of the parties. The evidence reflected that Wife retained her one sixth ownership in the flat throughout the marriage in her separate name. Husband did nothing to either enhance or diminish the value of said flat. Both Husband and Wife agree that some value of Wife's interest in the flat should be set over to Wife as a deviation from an equal division of marital property. Wife proposes that the full value of her one sixth interest of $8,333.00 be given to her as a deviation from an equal division of marital property.

App. pp. 13-14. In its detailed finding listing all of the parties' assets and their current values, the trial court subtracted the $8,333 value it assigned to the flat before totaling the "NET ASSETS SUBJECT TO DIVISION." Id. at 17. Of those assets, it awarded Natalia sixty percent of their total value and Alexander forty percent.

27

The trial court should not have set off the value of the flat before making its final calculation of the marital pot. However, this does not necessarily result in reversible error or require a remand to the trial court for further consideration. We faced a similar situation in Maxwell v. Maxwell, 850 N.E.2d 969, 973-74 (Ind. Ct. App. 2006), trans. denied, where the trial court valued property inherited by the husband and erroneously set off that property separately to the husband before making a final calculation of the marital pot, but we affirmed because the court had also entered findings, supported by the evidence, valuing the property and supporting a deviation from an equal division of the property in favor of the husband.

Here, likewise, the trial court entered a finding with respect to the flat explaining why it was appropriate to deviate from an equal division of property to effectively set aside the value of the flat to Natalia. That finding is supported by the evidence. Natalia purchased her interest in the flat before the marriage, it was never commingled with any jointly-acquired marital assets, the parties never lived there, and Alexander did nothing to contribute to any possible increase in or maintenance of the flat's value. See Castaneda v. Castaneda, 615 N.E.2d 467, 470-71 (Ind. Ct. App. 1993) (holding trial court did not abuse its discretion in setting aside entire value of inheritance wife received during marriage to her where money was kept separately in wife's name, it was never treated as or commingled with marital property, and husband did nothing to contribute to accumulation in value of the funds). If the trial court had included the assigned value of the flat in the marital estate, as it should have done, the "setting aside" of the flat to

28

Natalia results in a division of marital property 63%-37% in favor of her, not 60%-40% as the trial court found. Still, because the trial court adequately explained its reasoning for this three percent deviation with respect to the flat, separate and apart from its explanation for the 60/40 split (which we address later), there is no reversible error on this point.

Alexander also challenges the value the trial court assigned to the Natalia's interest in the flat. He claims the trial court should have accepted his testimony approximating the value of the flat at $146,000, with 1/6th of that value being $24,333 that should have been assigned to Natalia. By contrast, although Natalia did not orally state an opinion as to the current value of the flat, she submitted documentary evidence assigning the value of her interest in it at $8,333. There also was evidence as to an original purchase price for the flat of $16,000, although it is unfortunately unclear from Natalia's testimony whether that was the total purchase price or 1/6th of the purchase price.

A trial court has broad discretion in ascertaining the value of property in a dissolution action. O'Connell v. O'Connell, 889 N.E.2d 1, 13 (Ind. Ct. App. 2008). There is no abuse of discretion if the trial court's decision is supported by sufficient evidence and reasonable inferences therefrom. Id. An abuse of discretion will be found if there is no evidence in the record supporting a trial court's decision to assign a particular value to a marital asset. Id. at 13-14. Generally, "A valuation submitted by one of the parties is competent evidence of the value of property in a dissolution action

29

and may alone support the trial court's determination in that regard." Houchens v. Boschert, 758 N.E.2d 585, 590 (Ind. Ct. App. 2001), trans. denied.

There was no requirement here that the trial court accept Alexander's proposed valuation over Natalia's. Alexander seems to suggest that his figure was better supported by evidence regarding current market conditions in St. Petersburg and the like. It was for the trial court, however, to choose between the different valuations put before it.

We would also note that even if Alexander's estimate that the flat as a whole was worth $146,000 is somewhat accurate, that is not the same thing as saying that Natalia's $1/6^{th}$ interest in the flat was worth $1/6^{th}$ of its total value, or $24,333. When valuing property, "[f]air market value is the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale." City of Carmel v. Leeper Elec. Services, Inc., 805 N.E.2d 389, 395 (Ind. Ct. App. 2004), trans. denied. Although things may work very differently in Russia than in Indiana, we think it is fair to assume that a $1/6^{th}$ interest in a one-room flat is less marketable than an interest in the entire flat or, at the least, a $1/6^{th}$ interest in a flat that is subdivided into different habitable spaces so that multiple unrelated persons could live there. It is reasonable to think that even if the flat as a whole was worth $146,000, it would be very difficult for Natalia to sell her $1/6^{th}$ interest in it, which she shared with relatives, to an unknown person for $1/6^{th}$ of the total value of the flat, or $24,333. Certainly, Alexander presented no evidence that Natalia reasonably could be expected to do so. Under the

30

circumstances, we cannot say the trial court abused its discretion in valuing Natalia's 1/6th interest in the flat at $8,333.

### B. Personal Property

Alexander's next argument with respect to the division of property is that the trial court erroneously failed to consider several thousand dollars in household goods and personal property Natalia allegedly acquired shortly before she petitioned for dissolution and the parties were legally separated. Indiana Code Section 31-15-7-4(a)(2)(B) requires the trial court to divide any property "acquired by either spouse in his or her own right . . . . before final separation of the parties . . . ." "Final separation" occurs when a petition for dissolution is filed. I.C. § 31-9-2-46.[5] Here, that date was January 20, 2009. Natalia had physically moved out of the marital residence approximately two months earlier.

The trial court entered the following finding regarding the parties' household goods: "25. The parties agree and the Court finds that Husband had household goods with a value of $1,000.00 and Wife had household goods with a value of $300.00 at the time of separation." App. p. 14. This finding is clearly erroneous. First, Alexander did not agree that Natalia owned $300 in household goods at the time of separation. The finding regarding $300 was based upon Natalia's testimony regarding what she took from the marital residence when she moved out. It does not establish the value of personal property or household goods that she owned on the later date of final separation.

---

[5] "Final separation" may occur earlier if the parties had filed a petition for legal separation. <u>See</u> I.C. 31-9-2-46(1) & (2). No such petition was filed in this case.

Moreover, Alexander has consistently questioned Natalia's assertion that she only had $300 in household goods or personal property at the time of final separation. To that end, he submitted bank statements from accounts owned by Natalia showing deposits and expenditures of approximately $8,100 in the two to three months before she filed for divorce, although her accounts had only about $700 in them when the dissolution petition was filed.[6] A number of the purchases are for several hundred dollars from stores such as Kohl's, Tjmaxx, Value City, and other furniture stores. Natalia also testified that after moving out of the marital residence, she had to purchase a number of items including linens, furniture, and other household items in order to establish a new home. She also had to spend money on things such as food and renting an apartment.

In sum, we conclude that remand is required for the trial court to reconsider clearly erroneous finding number 25. It does appear that Natalia clearly purchased a significant amount of personal property in the month or two leading up the filing of the dissolution petition, well in excess of $300 worth. On the other hand, the trial court is not required to blindly accept Alexander's assertion of how much personal property/household goods Natalia purchased before the filing of the petition.[7] It is, however, required to consider purchases Natalia made after she moved out of the marital residence but before the date of final separation, to include that property as marital

_____

[6] Natalia testified that these funds came from business projects, plus some small payments from her sister and older son.

[7] For example, in addition to fungible items such as food or gas, money spent to rent an apartment would not constitute a household good or personal property.

property, and recalculate the total value of the marital estate. Such recalculation may result in a reduction of the cash equalization payment that Alexander owes to Natalia.

### C. Pension and 401(k)

Next, Alexander argues that the trial court erred in setting aside his defined pension entirely to him and the 401(k) account, as valued at the time of separation, entirely to Natalia. He contends the trial court violated Indiana Code Section 31-15-7-7, which requires a trial court, when dividing marital property, to "consider the tax consequences of the property disposition with respect to the present and future economic circumstances of each party." Under this statute, "only tax consequences necessarily arising from the plan of distribution are to be taken into account." Granger v. Granger, 579 N.E.2d 1319, 1320 (Ind. Ct. App. 1991), trans. denied. "A taxable event must occur as a direct result of the court-ordered disposition of the marital estate for the resulting tax to reduce the value of the marital estate." Id. at 1321. Alexander also claims that by awarding the pension to him and the 401(k) to Natalia, he "alone bears the risk of the actuarial assumptions, underfunding, and the stability of the company . . . ." Appellant's Br. p. 45. Instead, he asserts that the trial court should have divided each retirement account 60-40, as it did with the marital estate as a whole.

We agree with Natalia that Alexander has waived his claims of error with respect to this issue. First, Alexander presented absolutely no evidence regarding any negative tax consequences that could arise with respect to distribution of these retirement plans. Thus, we cannot see how the trial court erred in failing to address an issue upon which

33

Alexander presented no evidence. Second, although Alexander proposed to the trial court that Natalia receive a percentage of his pension payments upon his retirement through a QDRO, he also assigned the entire 401(k) account solely to himself. Thus, Alexander sought to preclude Natalia from receiving any of the 401(k) account funds that accumulated during the marriage. The trial court rejected that attempt and instead sought to equitably divide the property by granting the 401(k) to Natalia and the pension to Alexander, which had roughly equivalent values at the time of separation. Alexander's argument on appeal that the trial court should have divided the accounts differently is a much different argument than he made below. He also made no arguments regarding "actuarial risk" associated with the pension. "Failure to raise an issue before the trial court will result in waiver of that issue." Heaphy, 896 N.E.2d at 555. We will not further address this issue.

### D. 60/40 Division of Marital Estate

The final issue we address in this appeal is whether the trial court erred in deviating from an equal division of the marital property to award Natalia 60% of the marital estate and Alexander 40%. Indiana Code Section 31-15-7-5 states:

> The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:

34

(1)    The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2)    The extent to which the property was acquired by each spouse:

      (A)    before the marriage; or

      (B)    through inheritance or gift.

(3)    The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4)    The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5)    The earnings or earning ability of the parties as related to:

      (A)    a final division of property; and

      (B)    a final determination of the property rights of the parties.

When a party challenges a trial court's division of marital property, he or she must overcome a strong presumption that the court considered and complied with the applicable statute, and we will reverse a division of marital assets only for an abuse of discretion. Estudillo v. Estudillo, 956 N.E.2d 1084, 1090 (Ind. Ct. App. 2011). We will consider only the evidence most favorable to the court's disposition of the property, without reweighing the evidence or assessing the credibility of witnesses. Id. at 1090-91.

35

When deciding whether to deviate from an equal division of property, the trial court must consider all of the factors in Section 31-15-7-5 together. Eye v. Eye, 849 N.E.2d 698, 701 (Ind. Ct. App. 2006).

The trial court's findings here indicate that it considered all of the statutory factors before deviating from an equal division of property and awarding Natalia 60%, or actually 63%, of the marital estate. As discussed earlier, it found that Natalia's St. Petersburg flat was an asset Natalia brought into the marriage that should be effectively set aside to her. Conversely, it found that the funds Alexander brought into the marriage and that were used as a down payment on the marital residence—apparently $37,200— should not be set aside separately to him. It found no evidence of dissipation by either party, nor that either of them inherited property or received significant gifts. It also found that the parties made essentially equal contributions to the marriage, Alexander primarily through his income and Natalia primarily through household management and child rearing. Ultimately, it found that deviation was necessitated by the disparate earning abilities of the parties.

First, Alexander challenges the trial court's decision not to consider the $37,200 of pre-marital funds he brought into the marriage as either a justification for deviation in his favor, or setting aside separately to him as it did Natalia's interest in the St. Petersburg flat. However, those funds were treated by the parties much differently than the flat. Specifically, the funds were entirely commingled with marital assets and arguably the most important marital asset, i.e., the marital residence. Natalia as a homemaker

36

contributed to maintenance of the residence's value during the marriage. Under the circumstances, we cannot say the trial court clearly erred or abused its discretion in declining to treat Alexander's pre-marital funds as property that should effectively be set aside to him. Cf. Castaneda, 615 N.E.2d at 470-71 (again, holding trial court did not abuse its discretion in setting aside entire value of inheritance wife received during marriage to her where money was kept separately in wife's name, it was never treated as or commingled with marital property, and husband did nothing to contribute to accumulation in value of the funds).

Second, Alexander contends the trial court erred in determining that the disparity in the parties' earning capacities warranted a 60/40 deviation in favor of Natalia. He argues that because he is set to retire in about ten years, while Natalia could work for twenty or more years, their respective total incomes before retirement will actually be $1.5 million for Natalia and $1 million for Alexander. Alexander's calculations are based upon the assumption that Natalia will work full-time for over twenty years at an average of $35 per hour as an art conservator.

However, as we already discussed in the context of child support, Natalia's future earning ability is highly speculative, based on the nature of the work she does and her background and training. Alexander, meanwhile, works as a scientist for a Fortune 500 company and has worked in the pharmaceutical field in the United States for approximately twenty years. His income has increased substantially every year since beginning to work for Lilly in 2002. Also, as the evidence demonstrated, Lilly provides

37

Alexander with a defined benefit pension, a 401(k) plan, and a health insurance plan. Natalia, being self-employed, has no such plans and must provide entirely for her retirement and health care. Alexander's income estimates for Natalia also seem to fail to consider business overhead costs that she would have in being self-employed, while he has no such costs. Again, we cannot say the trial court clearly erred or abused its discretion in finding that the parties had vastly disparate earning potentials and that, with the other statutory factors being equal, a deviation from 50/50 division of the marital property in favor of Natalia because of that disparity was warranted.

## Conclusion

We reverse the trial court's decision to make Alexander's new child support obligation effective July 21, 2010, as opposed to July 8, 2011. We also remand for the trial court to enter appropriate findings regarding treatment of Alexander's 401(k) contributions for purposes of calculating his available child support income and to recalculate his support obligation if it determines to exclude some portion of his 401(k) contributions from his income. In all other respects we affirm the child support order. Regarding property division, we remand for recalculation of the amount of household goods/personal property Natalia possessed on the date of final separation and for inclusion of that amount in the marital estate. In all other respects we affirm the division of the marital property.

Affirmed in part, reversed in part, and remanded with instructions.

FRIEDLANDER, J., and MAY, J., concur.