Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Nov 12 2013, 5:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**BRYAN LEE CIYOU**
**LORI B. SCHMELTZER**
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**SUSAN E. SCHULTZ**
Corydon, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MATTHEW TOWNSEND, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 31A04-1303-DR-133 |
| | ) | |
| LYVONDA TOWNSEND, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE HARRISON CIRCUIT COURT
The Honorable John T. Evans, Judge
Cause No. 31C01-1107-DR-169

**November 12, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Matthew Townsend ("Father") appeals the trial court's award of child custody of his son, E.T., to his ex-wife, Lyvonda Townsend ("Mother"). We affirm.

**Issue**

The sole restated issued before us is whether there is sufficient evidence to support the trial court's initial award of custody of E.T. to Mother following the parties' divorce.

**Facts**

The evidence most favorable to the trial court's ruling is that the parties were married in 2006. After the marriage, Mother moved from her hometown of Paoli, where her mother lived, to Corydon, in a residence that Father chose. Mother's son from a different relationship, D.V., did not move in with the parties in Corydon until 2007, after Father approved of it. E.T. was born to the parties in September 2007. D.V. was approximately nine years older than E.T.

During the marriage, Father made all of the decisions regarding family affairs, such as housing, money, transportation, and activities, without input from Mother. Father also opened all the parties' mail and bills and did not communicate with Mother regarding their contents. The parties were only able to afford one vehicle, and Father would not allow Mother to use the vehicle to do things such as take E.T. to the doctor.

Mother also feared Father's inability to control his temper, which sometimes led to physical violence by Father. Mother implied that there were multiple incidents of violence but only described three in detail that happened in the presence of children. On one occasion, D.V. intervened in an altercation between Mother and Father in an attempt to

protect her, and Father pushed D.V. The parties separated after this incident. During a later attempt at reconciliation, Father became angry when Mother would not allow Father to look through her cell phone. Father damaged closet doors and a wall while E.T. hid under his bedcovers and cried.

In August 2011, after Father had filed for dissolution, an altercation arose when Father visited Mother's residence with E.T. to satisfy himself that it was a suitable residence for E.T.[1] During this visit, Father again attempted to look through Mother's cell phone but she refused. Mother also apparently wanted E.T. to stay with her for the evening, even though her parenting time was not scheduled to begin until the next day. During a struggle over who would get to keep E.T., Father pushed Mother to the ground in a parking lot, causing two broken fingers, two broken toes, and skinned knees, for which she sought treatment at a hospital. Police were called to the scene but did not make any arrests. Later, the prosecuting attorney filed a charge of Class D felony domestic battery against Father. On September 4, 2012, the prosecuting attorney dismissed the charge without prejudice. During the approximately one year that the charge was pending, a no contact order was in place that prohibited direct communication between Father and Mother.

E.T. attended a preschool in Corydon during the 2011-12 school year. On one occasion E.T. had a bad day at school that included his hitting two female classmates. When Mother arrived to pick E.T. up the teacher told Mother about the incident and Mother responded by sighing and turning away, but did not say anything. The teacher then wrote

---

[1] The trial court's temporary custody ruling split legal and physical custody evenly between the parties.

3

a letter to Father expressing her concern about E.T.'s behavior and Mother's apparent "indifference" to it. Ex. 5. Mother later explained that she was disappointed that E.T. appeared to be modeling behavior he had witnessed Father engage in. On another occasion Mother failed to schedule a parent-teacher conference for E.T. and claimed not to have known when they were to take place or that she needed to schedule one, although the teacher asserted that multiple notices about it had been sent home or posted. The teacher also said that she had much interaction with Father, but very little with Mother, regarding E.T. Mother also took E.T. to the wrong orientation session for the beginning of the 2012-13 preschool year.

Additionally, in December 2011, Mother took E.T. to a dentist in Paoli for treatment for abscessed teeth. After Mother received an antibiotic for E.T. and made arrangements for follow-up care, Father scheduled surgery for E.T. to have the abscessed teeth removed by a different dentist in Jeffersonville without first consulting Mother. Father, who like Mother had no insurance for E.T., faxed a request to Mother's attorney that Mother provide a written statement that Father had 51% custody of E.T., as required for Father to apply for and receive Medicaid coverage for the dental surgery. Mother did not provide such a statement and claims to have not received advance notice of E.T.'s surgery. Father incurred a bill of approximately $7000 for the surgery; Mother later stated under oath that she would be willing to help Father pay that bill.

The trial court conducted a dissolution and child custody hearing on November 19, 2012. At that time, it was determined that Mother had moved back to Paoli. Mother testified that she did so because of her fear of Father and desire to be away from him. The

4

trial court was unable to complete the hearing on this date and continued it until February 13, 2013, although it did order the parties' marriage dissolved and their property distributed in accordance with their agreement. In the meantime, the trial court continued the joint custody arrangement and ordered that E.T. continue attending preschool in Corydon, over Mother's objection. It also designated Mother as the custodial parent for purposes of applying for Medicaid. At the February 13, 2013 hearing, Mother stated that she had successfully obtained Medicaid coverage for E.T. However, Father had recently become eligible through his employer to obtain insurance coverage for E.T.

On March 7, 2013, the trial court entered its order regarding custody of E.T. It stated in part that "[t]he parties cannot communicate with one another sufficient for the parties to share joint custody of the child" and that "[i]t is in the best interest of the child to be in the sole custody of Mother." App. p. 7. Father was granted visitation on alternating weekends, and on holidays as outlined in the Indiana Parenting Time Guidelines. The trial court also made the following limited findings, sua sponte:

> b. Father has been controlling towards Mother. Father has kept the parties' mail and only vehicle from her, thereby limiting her access to information and her movements. Domestic violence has occurred in the presence of the child causing injuries to Mother for which she sought medical attention.
>
> c. Mother lives in Paoli and Father lives in Corydon. Mother intends the child to attend preschool/kindergarten in Paoli. The distance between the parties makes a shared time schedule impractical and not in the child's best interest.

Id. Father now appeals.

5

**Analysis**

A trial court's initial child custody determination is afforded considerable deference on appeal because only the trial court sees the parties, observes their conduct and demeanor, and hears their testimony. Kondamuri v. Kondamuri, 852 N.E.2d 939, 945-46 (Ind. Ct. App. 2006). On review, we will not reweigh the evidence, judge the credibility of witnesses, or substitute our judgment for that of the trial court. Id. at 946. We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences drawn therefrom. Id. "[I]t is particularly difficult for a reviewing court to second-guess a situation that centers on the personalities of two parents battling for control of a child." Kirk v. Kirk, 770 N.E.2d 304, 308 (Ind. 2002).

We also note that the trial court here entered some limited sua sponte findings. When a trial court makes such findings, a general judgment standard of review controls as to any issues upon which the court has not entered findings, and specific findings control only as to the issues they cover. C.B. v. B.W., 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), trans. denied. It is unnecessary that each and every sua sponte finding be correct, and we may affirm a judgment with sua sponte findings if it is supported by other findings or is otherwise supported by the record. Id. Also, we may affirm a judgment with sua sponte special findings upon any legal theory supported by the evidence introduced at trial. Id. In other words, "we may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court." Id.

6

In making an initial custody determination, there is no presumption favoring either parent and a trial court must enter an order that accords with what it believes to be the best interests of the child. Ind. Code § 31-17-2-8. Among the factors a trial court should consider in making a physical custody determination are:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

Id.

7

With respect to legal custody, a parent who is granted such custody "may determine the child's upbringing, including the child's education, health care, and religious training." I.C. § 31-17-1-17(a). A trial court may award joint legal custody if it is in the best interests of the child, upon consideration of:

> (1) the fitness and suitability of each of the persons awarded joint custody;
>
> (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;
>
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
>
> (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;
>
> (5) whether the persons awarded joint custody:
>
> > (A) live in close proximity to each other; and
> >
> > (B) plan to continue to do so; and
>
> (6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

I.C. § 31-17-2-15. An award of joint legal custody is inappropriate "'if the parties have made child-rearing a battleground . . . .'" Carmichael v. Siegel, 754 N.E.2d 619, 635 (Ind. Ct. App. 2001) (quoting Periquet-Febres v. Febres, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995), trans. denied).

Father argues, in part, that the trial court's order is unclear as to whether it intended to award Mother sole legal custody of E.T. He correctly notes that legal custody is different

8

than physical custody and that the trial court's order in granting Mother "sole custody" does not use the words "physical" or "legal." App. p. 7. However, the trial court also expressly found that "[t]he parties cannot communicate with one another sufficient for the parties to share joint custody of the child." Id. Given this finding, which Father does not directly challenge, we believe it is clear that the trial court, in granting "sole custody" to Mother, intended to award her sole legal custody and primary physical custody of E.T., subject to Father's visitation rights. To the extent Father states in his brief that the trial court should have awarded joint legal custody of E.T., that is untenable in light of the finding of the parties' inability to effectively communicate regarding E.T.

Father does also argue that he should have been awarded sole legal custody of E.T. This argument is inextricably intertwined with his argument that he should have been awarded primary physical custody of E.T. Although legal and physical custody are separate issues, nonetheless, it would seem unworkable and undesirable to grant sole legal custody to one parent and primary physical custody to the other parent, especially where a decision not to grant joint legal custody is based upon the parties' failure to communicate.

We first address Father's claim that there is insufficient evidence to support the trial court's finding that "[d]omestic violence has occurred in the presence of the child causing injuries to Mother for which she sought medical attention." Id. Referring specifically to the August 2011 incident that led to the later-dismissed criminal charge against Father, he asserts "there is no proof other than Mother's testimony alone, to substantiate that Mother was the victim of domestic violence." Appellant's Br. p. 39. Even if this assertion is true, it would require us to violate our well-settled standard of review, and to engage in evidence

9

reweighing and judging witness credibility, to conclude that Mother's testimony alone would be insufficient to support the trial court's domestic violence finding.[2] We cannot do so. As for the prosecuting attorney's decision to dismiss the criminal charge against Father for whatever reason, that action in no way precluded the trial court from finding that the August 2011 incident happened exactly as Mother described—i.e., that she was pushed to the ground by Father in E.T.'s presence and sustained injuries as a result.

Father has not mentioned or addressed Mother's testimony regarding two other violent incidents by Father in the presence of either E.T. or D.V. and her general implication that he has a short temper and frequently subjected her to violence. Although the trial court did not enter specific findings regarding this testimony, we are not required to ignore it, given that the trial court's limited findings were entered sua sponte. We may look to the entire record for evidence supporting the trial court's ultimate judgment. That record as a whole supports the conclusion that there was evidence of a pattern of domestic or family violence by Father, which is a statutory factor to consider when making a custody determination.

Father also challenges the trial court's finding that he "has been controlling towards Mother. Father has kept the parties' mail and only vehicle from her, thereby limiting her access to information and her movements." App. p. 7. It is unclear that Father's

---

[2] Father also argues that the trial court erroneously admitted photographs Mother proffered that she testified depicted the injuries she sustained during this incident, because of an alleged lack of foundation. "In authenticating a photograph, the witness must establish that the photograph is a true and accurate representation of what it is meant to portray." Cohen v. State, 714 N.E.2d 1168, 1175 (Ind. Ct. App. 1999), trans. denied. Mother testified that the photographs were taken of her at the hospital by a friend on the same day that the August 2011 incident occurred, in direct contrast to Father's claim that Mother never testified when the pictures were taken. This was sufficient to allow admission of the photographs.

"controlling" of Mother would be relevant to a determination of who should have custody of E.T., if it were not for the fact that Father argues he is entitled to custody of E.T. because he has always made the major decisions regarding E.T.'s upbringing, medical care, and education. In other words, if Mother was less involved in such major decisions as a result of Father's controlling personality, it explains <u>why</u> Mother was less involved, casts a less favorable light upon Father, and does not necessarily mean Mother would be an uninvolved or neglectful parent if she has custody of E.T.

We believe the trial court's finding regarding Father's "controlling" nature is supported by the following testimony, which began with a discussion of the fact that the parties could only afford one vehicle:

> Q: And during the day if Matt would go to work did you have a vehicle available to you?
>
> A: No.
>
> Q: So, if you needed to take one of your kids to the doctor or something of that nature, what did you have to do in order to be able to take the child to the doctor?
>
> A: I would have to ask Matt for the money and—
>
> Q: And the car?
>
> A: And the car, and that was never allowed.
>
> Q: Who controlled the activities in the home that the two of you lived in together?
>
> A: Matthew.
>
> Q: Did you have any input into the decisions that were made regarding where you were living or what activities you were doing?

11

A:      No.

Tr. pp. 194-95. Mother also described Father forcing her to go on a trip to Washington[3] to visit Father's ill grandfather, despite her saying she did not want to go, and which also caused D.V. to miss ten days of school. She further testified:

A:      I never received any mail. Matt was always the one to get the mail and check the bills and do the bills. He was all over that, so I never had anything to do with getting any letters or bills or anything.

Q:      Did he share any of that information with you?

A:      No. I've never seen any of those documents, papers.

Id. at 195. Mother also discussed the fact that Father enrolled E.T. in the preschool without any input from Mother, and that he scheduled dental surgery for E.T. for the abscessed teeth without consulting her first, even though she had already arranged dental care for those teeth with a dentist in Paoli.[4] Furthermore, on at least two occasions Father attempted to examine Mother's cell phone, leading to altercations each time. This evidence and the reasonable inferences therefrom support the trial court's finding regarding Father's "controlling" of Mother. It also gives less weight to Father's claim that he always took E.T. to his medical appointments and things of that nature, as there is a reasonable inference

---

[3] The record is unclear as to whether the parties went to Washington, Indiana, or Washington, D.C., or the State of Washington.

[4] Father attempts to blame Mother for E.T.'s abscessed teeth, noting that they were apparently caused by poor diet and dental hygiene and alleging that Mother herself has bad teeth. This argument seems to ignore Father's claim that he was the person most responsible for E.T.'s care during the marriage and that custody of E.T. was split 50/50 during the parties' separation.

12

to be made that Mother was unable to do so because of Father' control of the parties' sole means of transportation.

Father also asserts that Mother failed to ensure that E.T. had medial insurance; this is apparently based upon Mother's refusal to concede that Father had custody of E.T. 51% of the time as needed for Father to obtain Medicaid for E.T. prior to his dental surgery. Mother's refusal to make this concession at Father's demand did not prevent E.T. from undergoing the surgery, and Mother later stated under oath at one of the custody hearings that she was willing to help Father pay the resulting bill from that surgery. Also, after the first custody hearing and the trial court's clarification that Mother should be considered E.T.'s primary custodian for purposes of obtaining Medicaid, and before the second custody hearing, Mother did in fact obtain Medicaid coverage for E.T.

Father also suggests that Mother moved to Paoli in order to limit his contact with E.T. However, Mother testified that she moved to Paoli in order to distance herself from Father, whom she feared. There is sufficient evidence to support a reasonable basis for such fear. In any event, Mother's ties to Paoli are well-established, in that she lived there before the marriage and her mother still lives there and assists with child care. Father also argues that the distance between Corydon and Paoli is not so great as to preclude a joint custody order. The trial court expressly found to the contrary and we see no basis upon which we should disturb that finding. The traveling time between Corydon and Paoli is approximately one hour; it was reasonable for the trial court to conclude that such a travel time, in conjunction with needing to transport E.T. to full-day kindergarten in Paoli and

13

the parties needing to go to their respective jobs, would be undesirable as compared to allowing E.T. to reside most of the time in Paoli within minutes of his school.

We also note there is evidence in the record that E.T. is bonded to his half-brother, D.V., and that the two would live together with Mother in Paoli. A child's interaction with any siblings is a statutory factor to consider when determining custody. Father contends Mother has "abandoned" D.V. in the past, by having her mother care for him for extended periods of time, and suggests there is a likelihood she will do so again. The testimony of Mother and Father is, unsurprisingly, inconsistent regarding the length and reasons behind D.V.'s past stays with Mother's mother. For instance, Mother testified that one of D.V.'s extended stays with Mother's mother occurred after the parties' marriage and before Father consented to having D.V. live with them. In short, E.T.'s relationship with D.V. is another statutory factor weighing in favor of Mother having custody of E.T.

Finally, we acknowledge Father's lengthy arguments that Mother has not taken adequate interest in E.T.'s education, which he claims follows a pattern of not taking adequate interest in D.V.'s education. Although Mother has made some decisions regarding D.V.'s education that might be questionable,[5] there is no evidence that either his or E.T.'s education is being legally neglected. As for E.T., there was evidence that Father was the more involved or "hands-on" parent when it came to preschool, and that Mother on occasion made scheduling mistakes, such as failing to sign up for a parent-teacher

---

[5] For example, at the time of the custody hearings Mother was homeschooling D.V., despite the fact that she herself has neither a high school diploma nor GED. Regardless, there is no evidence or argument that such an arrangement violated Indiana law.

14

conference and not taking E.T. to the correct beginning-of-the-year orientation session. Mother asserted that these mix-ups were due to communication problems stemming in part from the parties' separation. Also, with respect to the incident in which E.T. hit two classmates, although Father attempts to paint Mother as not caring about this incident, there is no evidence as to how either parent disciplined E.T. after learning about the incident. Mother also testified that she did care about the incident because she was worried E.T. was modeling Father's behavior. Father also claims Mother has been more unpredictable than he has been regarding matters such as employment and housing.

Despite Father's arguments, to reverse the trial court here would require us to reweigh evidence. That is something we cannot do, especially in family law cases. The question is not whether the trial court could have made a different ruling, or whether this court might have made a different ruling if we had been in the trial court's shoes, but whether the trial court's ruling is sustainable on any basis. See Kirk, 770 N.E.2d at 307 (quoting Brickley v. Brickley, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). The evidence of domestic violence and of E.T.'s relationship with his half-brother D.V., along with the reasonable move of Mother to Paoli and the controlling nature of Father that had prevented her from being more fully active in E.T.'s upbringing in the past, is sufficient to support the trial court's ruling.

**Conclusion**

Given the trial court's findings, which are supported by the evidence, as well as the record as a whole, we cannot say the trial court abused its discretion in awarding Mother sole legal and primary physical custody of E.T. We affirm.

Affirmed.

CRONE, J., and PYLE, J., concur.